Docket No. 107309.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RODNEY ADKINS, Appellee.

*Opinion filed October 21, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Justice Kilbride took no part in the decision.

## OPINION

Following a jury trial in the circuit court of Cook County, defendant Rodney Adkins was found guilty of first degree murder (720 ILCS 5/9–1(a) (West 2002)), home invasion (720 ILCS 5/12–11(a)(2) (West 2002)), and residential burglary (720 ILCS 5/19–3(a) (West 2002)). He waived a jury trial for the sentencing phase. In a subsequent bench trial, he was sentenced to death. He filed a motion for a new trial, which was denied by the trial court. His appeal lies directly to this court under Supreme Court Rule 603 (134 Ill. 2d R. 603). For the reasons set forth below, we affirm his conviction and sentence.

## BACKGROUND

### The Crime Scene

On July 31, 2003, two burglaries and one murder were committed at 936 Washington Boulevard in Oak Park. When Frank Perino, a resident of the building, returned from work that afternoon and entered through the rear entrance, he noticed that the back door of Catherine McAvinchey's condominium unit had been forced open. He called the police and let them inside the building when they arrived. Officer Michael Kelly and two other officers entered the unit that had been broken into and found McAvinchey, face down on the floor. Firefighters who responded detected no vital signs.

The officer who processed the scene observed that the rear door to the apartment had been kicked in. The footprint on the door was upside down, with the heel at the top of the print and the toe at the bottom. On a kitchen counter just inside the door, the officer found a plastic cap shaped like a cap for a soda bottle but "four or five inches around" with a slot in it, as if a large bottle had been used as a bank. In the kitchen sink, he found a large knife with a bloodstain beneath it. The knife matched a set of knives stored in a wooden block on the counter. At trial, a State Police DNA analyst testified that she compared blood samples collected at the crime scene to samples from defendant, his girlfriend Romanette Norwood, and the victim. Blood found on the handle and blade of the knife was consistent with the victim's.

In the living room, the officer found the victim lying face down on the floor with a large pool of blood around her head and neck. The pool of blood had begun to dry at the edges. Clear fluid found when the body was moved was later determined to be spinal fluid. A bloodstain on the back of her shirt appeared to have been made by wiping the knife blade on the shirt.

The apartment had been ransacked. Desk drawers and dresser drawers were pulled out. Two purses appeared to have been rifled through. An empty space on the desk, near a printer and power cord, was the size of a computer. A large plastic bottle with a picture of a football helmet on it was lying on a chair near the desk. The bottle had no cap and it appeared to match the bottle cap found in the kitchen.

Christine Callahan was the victim's neighbor. The two women,

-2-

along with Perino and a fourth resident of the building, used the same locked entrance in the rear of the building to access their units. The lock did not always work. The back door to Callahan's apartment was approximately 20 feet from the victim's back door. Callahan's apartment was also burglarized on July 31. Several pieces of jewelry were taken, along with a large plastic bottle with a Cleveland Browns logo in which she saved coins. She identified the bottle found on the chair in the victim's apartment as the one that had been taken from her apartment. At trial, a State Police fingerprint analyst testified that she compared latent fingerprints from the crime scenes to exemplars from defendant, Norwood, and the victim. She found one fingerprint belonging to the defendant on the plastic bottle.

The same officer who processed the murder scene processed Callahan's apartment. He observed that her back door had also been kicked in and her apartment ransacked. He found a cigarette butt on the floor at the bottom of a spiral staircase that led to the upper level of Callahan's unit. He collected the cigarette butt and sent it to the crime lab for processing. The State Police DNA analyst testified at trial that the male DNA profile found on the cigarette butt would be expected to occur in approximately one in 650 billion black individuals, one in 2.1 trillion white individuals, and one in 2.5 trillion Hispanic unrelated individuals. The profile matched defendant's DNA profile.

The Investigation

On September 8 and 9, 2003, Norwood was interviewed by the Oak Park police. She was wearing a Gucci watch and a pair of prescription eyeglasses, which were taken from her and inventoried as evidence. Information from this interview led police to a pawn shop and to the apartment of Fanny Roberts, defendant's mother. At the pawn shop, police obtained pawn sheets dated July 31, 2003, containing defendant's name. The police recovered a pair of sunglasses from Roberts' apartment.

On September 10, 2003, Norwood gave a videotaped statement to Assistant State's Attorney Jamie Santini. In this statement, she said that she had been defendant's girlfriend for 13 years and that she was then living with him. She stated that around June 24 or 25, they were

-3-

in Oak Park and "he had me ring somebody's bell" to see if the person was at home "[s]o he could burglarize it." She walked back to the corner, where defendant was waiting, and told him that no one was home. He went to the house and kicked the door in as she watched from the alley. She said that she did not enter the house. She left and did not see him again until he came to his cousin's house later with "some tapes, VCR, DVD, a couple of movies," which he said he got from the house he had burglarized.

Norwood described their activities over the next several days. On July 31, 2003, she slept until noon. Earlier that morning, she briefly awoke when defendant left. He kissed her on her jaw and said he was leaving and would be back. He returned at about 12:30 p.m., while Norwood and defendant's mother were watching television together. He was "sweating heavily" and he carried a black duffle bag. Defendant pulled two pairs of glasses from his pocket and gave them to Norwood. He took a watch from his other pocket and gave it to her. Santini showed her photographs of the glasses and the watch that she had been wearing earlier and of the sunglasses found in Roberts' apartment. She identified them as the same items defendant had given her. Defendant also gave a gold chain necklace to his mother. He opened the bag and "took out a black screen monitor" that was "like a computer" and put it on the bed. He also took out a laptop computer in a case and a bag full of coins. She had never seen any of these items in his possession before that date. She identified the laptop and the duffle bag from photographs she was shown by Santini.

According to Norwood, defendant left for a "couple of minutes," taking the computers to the next-door neighbor's to try to sell them. He returned with the computers, which he placed in his mother's room.

Norwood and defendant took a bus and a train to a pawn shop in Forest Park, where he pawned two rings for "about $70." Then they went to a liquor store so that he could convert the "[c]oins into money." Defendant purchased a "scratch out" lottery ticket and collected $500 in winnings. They bought some heroin and some "rocks" (cocaine), ate tacos, and walked to the Grand Hotel, where they checked into a room and remained for about eight hours.

The next morning, August 1, 2003, they went to Roberts' house to sleep. That evening, defendant's Uncle Kary came over with a

-4-

friend. Defendant brought out one of the computers to show the friend. Norwood turned it on for him and clicked on the "My Computer" icon. A name appeared on the screen, "[t]he lady name that was on the news, Catherine's McKen–I don't know." The television was on at the time and the victim's picture was on the screen with the name "Catherine McKenzie, something like that." She was "in a state of shock" and turned the computer off and closed it. Defendant then brought out the other computer to show the friend, who ended up buying both computers in a "package deal."

Later that night, she and defendant were at her mother's house when another news story about the murder came on the television. She "was hearing the whole story about the lady got slashed in the throat, something like that. And it seems to be that she stumbled up on the burglar." Norwood's mother glanced at defendant and asked him if he would do "something like that." He told her that he would not. A bit later, Norwood asked him again and he said "he didn't want to talk about it now," but he agreed to talk about it later at the hotel.

They purchased more drugs and went to another hotel, The Ritz. She identified the hotel from a photograph. When they were in the room, she asked defendant "did he do that to that lady." He said that "he didn't know if he killed her, he said he hit her. And she fell down cause she walked in on him and saw his face." He told her "it was a mistake. She walked in on me." They took some drugs, which made him tell her "more about it because he was just saying that he hit her, he didn't do all that other stuff to her." After he started smoking crack, "he broke out crying and stuff and he admit that he killed the lady." He asked Norwood if she would tell on him and she said she would not.

August 22, 2003, was her birthday. They were at his mother's apartment. She and defendant had an argument that day over the way he was treating her. She told him she wanted to break up and he "started going off." She told his mother that she was afraid of the defendant "[b]ecause he killed that lady. And I thought he would kill me as well."

The interview concluded with Norwood stating that she had been treated well by the police department, that no threats or promises were made to her, and that she was free from the effects of drugs or alcohol.

The victim's brother identified the watch and eyeglasses that were taken from Norwood and the sunglasses found in Roberts' apartment as his sister's. The State Police DNA analyst testified at trial that she found "a mixture" of DNA on the watch. One of the DNA profiles was female and was consistent with Norwood's. The other profile was male, but was insufficient for comparison.

The police also spoke by telephone to defendant's uncle, Kary Pugh, who told police that his friend, Earnest Hoskins, had the victim's computer. At trial, Hoskins testified that he and Pugh visited the residence of Pugh's sister-in-law, Fanny Roberts, on August 1, 2003. The defendant, who is Roberts' son, was there with his girlfriend, Romanette Norwood. Defendant showed two computers to Hoskins. The computers were in a black canvas duffle bag. One was a Sony Vaio laptop and the other was a "big, black" model that he was not familiar with. Hoskins offered to buy the computers for $250, not expecting defendant to accept so low an offer because the computers were worth much more. Defendant accepted the offer.

When contacted by the police, Hoskins explained to the police that he no longer had the computers in his possession, but that he could retrieve them. On September 12, 2003, Hoskins turned over the duffle bag containing the computers to the police. A service number on the Sony Vaio computer matched the victim's missing computer. When the police turned on the Vaio, a window appeared showing that the software was registered to the victim. At trial, Hoskins identified the duffle bag and the Sony Vaio computer and its carrying case.


Defendant's Statements

On September 17, 2003, Oak Park detectives took defendant from the Cook County jail to the Oak Park police station. After he was read his *Miranda* rights and signed a waiver, he was questioned initially by detectives William Cotter and Juan Paladines and later by Assistant State's Attorney Santini. Defendant made several incriminating statements.

According to the detectives' testimony, defendant said that he kicked in the back door of the victim's apartment and entered. He unlocked the front door to give himself a means of escape. He was inside, looking at a laptop computer, when he heard the front door

open. He saw a woman standing there, looking at him. Defendant claimed that Norwood knocked the woman to the floor and then he jumped on her upper back. He got a knife from the kitchen and began to cut her neck because he feared that she could identify him. He sawed on the back of her neck and, according to his statement, he told Norwood that because they were in this together, she had to do so as well. He stated that she did so. After he washed the knife in the sink, he continued to burglarize the apartment, taking several pairs of glasses, some jewelry, some change, and a laptop. He then went to the door of the adjacent apartment, kicked in that door, and burglarized that apartment.

The detectives then called Santini, who also interviewed defendant. Paladines sat in on that interview, during which defendant again admitted killing the victim and described the burglary and murder. Defendant agreed to give a videotaped statement.

The tape and a transcript were admitted into evidence at trial and the tape was played for the jury. In that statement, defendant said that he got up early the day of the murder so that he could "go out and work, you know, do a sting, you know, do a little hustle." Asked to explain what he meant, defendant said, "We'll go out from time to time and burglarize." He said that "about 70 percent of the time," he and Norwood would commit burglary together. She would go to the door of the home or apartment while he walked to the corner. She would ring the bell to make sure no one was at home. Defendant also explained that he liked to start early in the day, so "you can see people going to work, you know, you can see them leave the house." They did not normally wear gloves, but would put circles of tape on the tips of their fingers to avoid leaving fingerprints. He claimed that he and Norwood were wearing tape on their fingers the day of the killing.

When he got to the back doors at 936 Washington Boulevard, he could hear Norwood "still ringing the bell," so he knew there was no one at home. He then "donkey kicked" one of the doors, with his back to the door so that his heel was higher than his toes. The door gave way on the second kick. He went through the front door of the apartment and down the stairs to let Norwood inside. Once back in the apartment, he left the front door unlocked as a means of quick escape if it became necessary.

He went directly to the bedroom, because "that's where the

jewelry was at." Defendant stated that he ransacked the bedroom, taking a Gucci watch and stashing several pairs of eyeglasses in a duffle bag he found there. Santini showed defendant a photograph of the black bag recovered from Hoskins and defendant identified it as the same bag.

In the living room, he found two wallets. He took $185 in cash from one and several credit cards from the other. Santini showed him photographs of two wallets found in the victim's apartment and he acknowledged that he had opened them and taken cash and credit cards.

Defendant said that he then noticed a table with a computer on it and, on the floor next to the table, a laptop in a computer case. He identified a photograph of the table and pointed out where the laptop had been sitting on the floor. He said that he "got down on a knee to unzip" the computer case and was "closing it and zipping it up" when the victim returned through the front door. She was "about five feet" away from him and was looking directly at him. Defendant said that they "stared at each other for almost–it couldn't have been no more than like three or four seconds but it seemed like an eternity."

According to defendant, Norwood hit the victim from behind and knocked her to the floor. She fell "face first. And that gave me enough time to react." Because he knew that the victim would be able to identify him, he jumped on her several times, slamming his knee on the back of her neck between her shoulder blades. He believed that she was unconscious, but knew that she was still alive. Defendant said that he told Norwood, "she done already recognized me, so you know what we got to do."

Defendant went into the kitchen and grabbed a knife from a knife holder. Santini showed him a photograph of the knife holder, which he recognized. He explained that he slashed, stabbed, and sawed at the victim's throat. Detective Paladines bent over the table, face down, so that defendant could demonstrate how he used the knife on the victim.

Defendant stated that while the victim was coming out of her initial unconsciousness, she was making a "gargling" sound. He claimed that at this point, he told Norwood that they were "in this together" and that Norwood had to prove her "solidarity." According to him, Norwood put her hand on the knife handle and "did like a little

-8-

sawing motion." Defendant wiped the knife on the back of the victim's shirt, then took it back to the kitchen where he rinsed it off, wiped it off to erase any palm prints, and left it in the kitchen sink. Santini showed him a photograph of the knife as it was found in the kitchen sink. Defendant said, "That's the knife *** in the sink where I left it."

Defendant stated that he then collected the duffle bag, some CDs, some DVDs, and the laptop and went out the back door, where he kicked in the door to another apartment and burglarized it. He took a computer and some rings. He found a large glass jar filled with change, which was too heavy to carry. He could not explain how the Cleveland Browns bottle got from Callahan's apartment to the victim's apartment. He thought that "maybe Romanette brought it."

Defendant and Norwood went "straight out the front door." He stated that neither he nor Norwood had any blood on them. He carried the black duffle bag and she was carrying another bag. They returned to the apartment they shared with his mother to drop off some of the stolen property.

He had not told Norwood about the nearly $200 in cash that he had taken and he did not want her to know. Later that day, they sold two stolen rings at a pawn shop for $50 or $60 and he gave Norwood some of the money.

At a nearby liquor store, he exchanged the stolen coins for about $55 in bills and purchased some liquor and a scratch-off lottery ticket. The ticket was a winner and he collected another $500 in cash. He and Norwood bought "a couple blows and then we got some rocks and some weed," referring to heroin, cocaine, and marijuana. They spent several hours in a motel, "had sex, got high," before returning to his mother's apartment.

Defendant tried, unsuccessfully, to sell the computers to a neighbor. A day or two later, his uncle came over to have defendant cut his hair. The uncle brought a friend with him. Defendant identified a photograph of Hoskins, whom he knew as "Bishop," as that friend. His uncle was not interested in the computers, so defendant offered the Sony Vaio to Hoskins for $500. Initially Hoskins was not interested, but then he offered defendant $300, which defendant accepted. He and Norwood took the money and "left again after that

and checked into another motel."

At the conclusion of the taped interview, defendant was asked how he had been treated while at the Oak Park police station. He replied, "I been treated just." He acknowledged that he had been given food and something to drink and that he was given cigarettes to smoke. Overall, he said, "I been treated justice. It was almost like a big burden, you know, being lifted from my soul."

Trial

With the exception of Norwood's videotaped statement, which was admitted only at the sentencing phase, all of the facts summarized above came into evidence at trial.

In addition, a deputy medical examiner testified that the victim had been stabbed under the chin and on the right side of her neck. This wound severed her carotid artery. She also had a gaping incision wound on the back of her neck, consistent with a sawing motion, which was so deep that it fractured two cervical vertebrae. Another cervical vertebra, two thoracic vertebrae, and 13 ribs were also fractured. The knife from the sink could have caused the wounds to her neck. The victim also had dozens of injuries to her face, including a laceration and bruise of her upper right eyelid, petechial hemorrhages of her right eye, and abrasions on her right cheek. Her lips were lacerated in several places and she had abrasions on the bridge of her nose. She also had several hemorrhages to her brain, consistent with blunt force trauma. The fractures were consistent with a man of defendant's size jumping on the victim's spine. These injuries would have rendered the victim paraplegic from the chest down. Other lacerations, bruises, and abrasions were consistent with an assault. A stab wound on the victim's hand was consistent with her trying to ward off the attack. In the medical examiner's opinion, the cause of death was multiple injuries from an assault; the manner of death was homicide.

After the State rested its case, the defense rested without presenting evidence. Closing arguments were made and jury instructions were given. The jury found defendant guilty beyond a reasonable doubt of first degree murder, home invasion, and residential burglary.

-10-

ANALYSIS

I. Potential Juror Excused for Cause

During *voir dire*, venire member C.B. told the court that she had never been an accused, a complainant, or a witness in a criminal case. The prosecutor moved to excuse her for cause because her "rap sheet" showed that she had been charged with misdemeanor battery in 1991. The battery charge was "SOL'd," or stricken with leave to reinstate. Defense counsel objected and requested that the court question C.B. in chambers to determine whether she had simply forgotten about the incident that occurred 16 years ago, if she thought that the dismissal meant that she had not been "accused" of a crime, or if she had some other reason for not mentioning it. The trial court denied the request and excused C.B. for cause. Defendant argues that the trial court abused its discretion and that, as a result, he is entitled to a new trial.

*Voir dire* in criminal cases is governed by Supreme Court Rule 431 (177 Ill. 2d R. 431). Prior to the adoption of this rule, this court held that the trial court bears primary responsibility for conducting the *voir dire* examination and, thus, the manner and scope of that examination rests within the discretion of that court. *People v. Williams*, 164 Ill. 2d 1, 16 (1994). See *People v. Garstecki*, 234 Ill. 2d 430, 437-38 (2009) (explaining significance of replacement of Supreme Court Rule 234 with Supreme Court Rule 431). Under this rule, the trial court's discretion is guided by a preference for permitting direct inquiry of prospective jurors by the attorneys if such an opportunity is sought. *Garstecki*, 234 Ill. 2d at 444-45.

The present case, however, does not involve a request by an attorney to submit questions for *voir dire* or to directly question the venire. Rather, the present case involves the trial court's decision to grant the State's request to excuse a prospective juror for cause after *voir dire* has been concluded. "An abuse of the court's discretion will be found only if, after a review of the record, it is determined that the conduct of the court thwarted the selection of an impartial jury." *Williams*, 164 Ill. 2d at 16. Defendant argues that despite the trial court's discretion in this matter, the "proper procedure" calls for an inquiry if it comes to the attention of the trial court, either while *voir dire* is in progress or when it has just been completed, that there are facts contradicting an answer given during *voir dire*. He argues further that when failure to adequately question a venire member is brought

-11-

to the trial court's attention in a timely manner, the proper remedy is a new trial. Defendant relies on two decisions of the appellate court for these propositions.

In *People v. Green*, 282 Ill. App. 3d 510 (1996), the court found an abuse of discretion where the trial court refused to reopen *voir dire* to reexamine three venire persons whose jury cards indicated that they had been victims of crimes, but who failed to so state in open court when the members of the venire were asked the question. *Green*, 282 Ill. App. 3d at 514. Because the defense had used its nine peremptory challenges to excuse other venire members, the three individuals in question were seated on the jury. *Green*, 282 Ill. App. 3d at 513. As a result, the defendant, who was charged with attempted murder and other crimes in connection with a shooting, may have been tried by a jury that included members who had been victims of one or more of the same crimes. *Green*, 282 Ill. App. 3d at 514. The appellate court noted that a "limited inquiry would have satisfied the purpose of *voir dire* to expose potential bias or prejudice, would have resulted in only a minor delay in jury selection and would have resolved the issue as to whether [the three individuals] were in fact crime victims, as well as the effect such involvement would have had on their ability to be impartial." *Green*, 282 Ill. App. 3d at 514, citing *People v. Mitchell*, 121 Ill. App. 3d 193 (1984).

Defendant also relies on *Mitchell*, in which the appellate court reversed the defendant's conviction for burglary on the basis that the trial court abused its discretion by denying a defense motion to reopen *voir dire* as to one of the jurors. *Mitchell*, 121 Ill. App. 3d at 196. During *voir dire*, the juror said that he had never been the victim of a crime. He was accepted as a juror and sworn before defense counsel learned that the prosecutor had background information regarding the venire members. This document revealed that the juror had been a victim of a burglary, the same crime for which the defendant was on trial. *Mitchell*, 121 Ill. App. 3d at 194. The court relied on this court's decision in *People v. Kurth*, 34 Ill. 2d 387 (1966), overruled on other grounds in *People v. Beardsley*, 115 Ill. 2d 47 (1986), for the proposition that "where information showing prejudice or potential prejudice of a seated juror is brought to the attention of the court during or immediately after *voir dire*, the proper procedure would be further inquiry by the court." *Mitchell*, 121 Ill. App. 3d at 194. The

court concluded, further, that "issues involving the right to a fair trial by a panel of impartial jurors cannot be disposed of by the harmless error rule" and, thus, reversal of the defendant's conviction was necessary. *Mitchell*, 121 Ill. App. 3d at 196.

Neither *Green* nor *Mitchell* offer any support for defendant's position because both cases involved the seating of a juror or jurors who were potentially biased against the defendant. In the present case, no potentially biased juror was seated. Instead, a potential juror was excused for cause over a defense objection.

*Williams* is factually similar to the present case. Both on the juror information card and during *vior dire*, a prospective juror failed to disclose that she was then under court supervision "for a marijuana case." *Williams*, 164 Ill. 2d at 15. The State asked that she be excused for cause and the defendant requested that she be questioned further about the marijuana case. *Williams*, 164 Ill. 2d at 16. The trial court excused her for cause and the defendant was subsequently found guilty of first degree murder for strangling a 97-year-old woman and of robbery for stealing the victim's stereo set. The defendant was sentenced to death.

On appeal to this court, the defendant argued that the trial court failed to properly exercise its discretion when it excused the prospective juror for cause. This court noted that the "purpose of *voir dire* is to assure the selection of an impartial panel of jurors free from either bias or prejudice" and concluded that the record "in no way" suggested that excusing this individual for cause impeded the selection of an unbiased and impartial jury. *Williams*, 164 Ill. 2d at 16-17. Further, the "veracity of those who testify during *voir dire* is a matter lying solely within the sound discretion of the circuit court, and the decision to excuse a potential juror because of a reasonable belief that that person has been untruthful under oath is a question best left with that court." *Williams*, 164 Ill. 2d at 17.

Defendant attempts to distinguish the facts of *Williams*, arguing that while there was "no chance" that the potential juror in *Williams* was mistaken about her criminal record because she was under court supervision at the time of trial, it is likely that C.B. either forgot or did not understand that she had an arrest record dating back 16 years. Thus, he argues, the trial court's conclusion that she was untruthful rather than merely mistaken was not "reasonable," as required by this

court in *Williams*.

We do not find the trial court's assessment of C.B.'s veracity to be unreasonable. We are reading the record and, thus, are not in a position to assess the credibility and demeanor of C.B. Instead, we must rely on the trial court's superior ability to make these assessments. See *People v. Harris*, 225 Ill. 2d 1, 38-39 (2007), quoting *Wainwright v. Witt*, 469 U.S. 412, 426, 83 L. Ed. 2d 841, 853, 105 S. Ct. 844, 853 (1985) ("deference must be paid to the trial judge who sees and hears the juror").

In addition, we note that when asked during *voir dire* whether the recent murder of her nephew would affect her ability to be an impartial juror, C.B. answered "yes." This may have been, as defendant suggests, an inadvertent misstatement, because she later said that she would be able to follow the law. However, " '[i]t is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court's discretion.' " *Harris*, 225 Ill. 2d at 38, quoting *People v. Shaw*, 186 Ill. 2d 301, 317 (1998).

## II. Other-Crimes Evidence

Prior to trial, the State filed a motion to use proof and evidence of other crimes, specifically limited to evidence of the burglary of Callahan's apartment. Although defendant was not charged with this burglary, it occurred in the same building on the same day as the murder. Property taken from Callahan's apartment was found in the victim's apartment and a cigarette butt containing defendant's DNA was found in Callahan's apartment. Thus, the State argued, evidence of the uncharged burglary was relevant to the murder charge. The State expressed its intent not to delve into any other residential burglaries that defendant was charged with or suspected of or any proceeds thereof. The motion was allowed.

Defendant filed a motion *in limine*, seeking to have portions of his videotaped statement redacted, specifically, any mention of other crimes he may have committed and his general explanation of the method or procedure he followed when committing burglaries. The State responded that his statement contained a full recollection of what he did on the day of the murder and, thus, any redaction would

lead to gaps in the narrative. The trial court denied the motion, but directed that no comment or argument be made regarding defendant's other crimes. The prosecutor responded that he had "no intention" of mentioning any of defendant's other crimes and that the "other pending residential burglary charges will absolutely not come in in the State's case in chief." Further, the "police officers testifying will be directed not to talk about the other charges, other cases."

In his posttrial motion, defendant argued that evidence of his commission of other crimes was improperly admitted. A hearing was held on his motion and the motion was denied. Defendant argues to this court that evidence of his commission of other crimes was improperly admitted in two instances. Thus, he argues, he is entitled to a new trial.

Evidence that a defendant has committed crimes other than the one for which he is on trial may not be admitted for the purpose of demonstrating his propensity to commit crimes. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Such evidence, however, may be admitted for a proper purpose such as proving *modus operandi*, intent, identity, motive, or absence of mistake. *Illgen*, 145 Ill. 2d at 364-65. Even if relevant to a purpose other than showing the mere propensity to commit crime, evidence of other crimes may be excluded if its probative value is outweighed by its prejudicial effect. *Illgen*, 145 Ill. 2d at 365. The admissibility of evidence at trial is a matter within the sound discretion of the trial court and that court's decision will not be overturned absent a clear abuse of that discretion. *Illgen*, 145 Ill. 2d at 364. Erroneous admission of other-crimes evidence calls for reversal only if the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339 (2000).

A. *Detective's Testimony*

At trial, Detective William Cotter of the Oak Park police department testified that he and Detective William Ballard brought defendant to the police station for questioning. After processing, including the collection of a buccal swab for DNA comparison, defendant was placed in an interview room, where he was interviewed by Cotter and Detective Juan Paladines. The following exchange

occurred:

> "Prosecutor: Did either you or Detective Juan Paladines introduce yourselves to the Defendant?
>
> Cotter: Yes, we both introduced ourselves.
>
> Prosecutor: How did you do that? What did you say?
>
> Cotter: Just that my name, Detective Cotter with the Oak Park Police Department. Detective Paladines was actually the lead investigator. He introduced himself also."

The State's next witness was Detective Paladines, who testified that he was the lead detective in the investigation of the murder of Catherine McAvinchey. Paladines testified that he saw other detectives bring defendant into the Detective Bureau. He asked his immediate superior "if we could put Rodney in the back for a little bit to let him cool down." Having obtained permission to do so, he placed defendant in a holding cell. Eventually, Paladines escorted defendant from the holding cell to an interview room. The following exchange occurred:

> "Prosecutor: All right. Did you introduce yourself at that time to the Defendant?
>
> Paladines: I introduced myself initially when Rodney first came in.
>
> Prosecutor: How did you introduce yourself?
>
> Paladines: I said, 'Hi, Rodney. How you doing. I haven't seen you in a long time.'
>
> Prosecutor: Did you tell him who you were?
>
> Paladines: Yes.
>
> Prosecutor: Did you tell him–
>
> Defense Counsel: Objection.
>
> COURT: Sustained.
>
> Prosecutor: Did you tell him who you were?
>
> Paladines: Yes."

In his posttrial motion, defendant argued that the prosecutor acted intentionally to elicit information from which the jury would understand that the detective knew the defendant from past encounters and infer that he was "a criminal." At the hearing on the

motion, the prosecutor explained that she did not intend to elicit prejudicial information by asking the question. She did not anticipate that the detective would answer in this manner. Her purpose in asking the question was to demonstrate to the jury that the defendant knew to whom he was speaking. The trial court found this explanation credible.

In this appeal, defendant argues that the question was a deliberate and successful attempt to introduce prejudicial information to the jury. He asserts that the question was designed to elicit a response that revealed defendant was known to the police and, by implication, that he was a prior offender. Defendant also argues that the only questions that such an answer might have been relevant to–his motive and intent to commit burglary–were not in dispute because the defense strategy was to admit the burglary while denying the murder. Thus, the only purpose served by the question and answer was to demonstrate defendant's propensity to commit crimes. As a result, the prejudicial nature of the statement necessarily outweighed its relevance.

The State responds that the prosecutor's question was not a deliberate attempt to elicit information about other crimes and that the detective's answer to the question was unexpected. Further, the State argues that any error was cured because the trial court sustained defense counsel's objection following that answer and later instructed the jury to "disregard questions and exhibits which are withdrawn or to which objections were sustained." Finally, the State argues that any such error was not a factor in defendant's convictions, given the overwhelming evidence of guilt.

Defendant replies that the error was not cured by sustaining his objection or by the jury instruction because the jury would not have known which question and answer it was to disregard.

In *People v. Bryant*, 113 Ill. 2d 497 (1986), this court considered a similar situation, after having granted the defendant a new trial on other grounds. The defendant was charged with the attempted burglary of a service station. *Bryant*, 113 Ill. 2d at 500. A police officer testified that he was sent to the location in response to a call from a neighbor. He saw the defendant running away from the building and called for him to stop. The defendant continued running and jumped a fence. The officer shouted at him again and the defendant then stopped and returned to the station, where he was

placed under arrest. *Bryant*, 113 Ill. 2d at 500-01.

On cross-examination, it was revealed that the officer called the defendant by name when the officer said "I told him to freeze. He kept on going. I called him by name and I told him I would shoot." *Bryant*, 113 Ill. 2d at 514. Although the officer's use of defendant's name was inadvertently elicited on cross-examination, the prosecutor made use of this fact twice during closing argument. *Bryant*, 113 Ill. 2d at 514.

The record did not reveal how the officer happened to know the defendant's name, but this court noted the implication that might have been "conveyed by testimony of this nature" and instructed that, on retrial, such a statement by the officer would be "better avoided, unless somehow relevant." *Bryant*, 113 Ill. 2d at 514.

Similarly, in *People v. Stover*, 89 Ill. 2d 189 (1982), the defendant was granted a new trial on other grounds. He was charged with resisting or obstructing a peace officer. Police officers went to the defendant's apartment to arrest him. They announced their purpose and the defendant ran to the rear of the apartment. An officer pursued him and attempted to place him in handcuffs. A scuffle ensued and the officer eventually subdued the defendant. *Stover*, 89 Ill. 2d at 192.

At trial, the officer testified that on the day of the arrest, he was wearing his uniform, official hat, and deputy sheriff's badge. He was also wearing an equipment belt that contained a holster and weapon, handcuffs, and nightstick. *Stover*, 89 Ill. 2d at 192. This portion of the officer's testimony was relevant to the knowledge element of the offense charged. *Stover*, 89 Ill. 2d at 196. However, after eliciting this testimony, the prosecutor asked the officer whether he had been acquainted with the defendant prior to this incident and the officer answered, "Yes." *Stover*, 89 Ill. 2d at 192-93. The opinion does not indicate whether there was an objection to this question.

On appeal, defendant argued that the question and answer improperly provided a basis for the jury to infer that he had previously engaged in criminal conduct. This court noted that the defendant's knowledge that the person at his door was a uniformed police officer seeking to arrest him had already been clearly established before this question was asked. *Stover*, 89 Ill. 2d at 196. Because there was "no apparent reason why the prosecutor would inquire into defendant's previous acquaintance with [the officer] unless an implication of prior

-18-

criminal activity was intended," this court directed that such inquiry not recur on retrial. *Stover*, 89 Ill. 2d at 196.

Defendant argues that these two cases should lead us to conclude that he is entitled to a new trial on the basis of the prosecutor's question and Detective Paladines's answer. While we acknowledge that the answer contained information from which a reasonable jury might infer that defendant had a criminal record, we do not find either case persuasive. In both cases, the defendants had already been granted a new trial on unrelated grounds. Our discussion of this issue was *dicta*, intended only to guide the trial court and the State on retrial. We did not suggest that any such error was sufficient to require a new trial. In addition, the prosecutor's conduct in each case was a deliberate attempt to call attention to the defendant's familiarity with the police. In the present case, the trial court found the prosecutor's explanation credible. We note that she asked essentially the same question of both Cotter and Paladines for the same purpose–to demonstrate that the defendant knew that persons to whom he was speaking, neither of whom were in uniform, were police detectives.

The defense theory of the case was that defendant committed the two burglaries at 936 Washington Boulevard on July 31, 2003, but that he left with the stolen property before Catherine McAvinchey returned home and was killed by an unknown person. This theory accounted for all of the physical evidence that implicated defendant. In effect, the defense theory was that defendant was an experienced burglar, who was careful to ascertain that no one was present at any home or apartment he entered and that he had followed his usual pattern on the day of the murder. In addition, counsel attempted to portray defendant's incriminating statements to the police as the product of fear or manipulation, in an effort to persuade the jury to disregard them. He suggested, for example, that the lack of a videotape of defendant's arrival at the Oak Park police department might indicate that he was mistreated by the transporting officers.

Defense counsel's cross-examination of Cotter began with the question: "That day [September 17, 2003], you went and got Rodney Adkins from the Cook County Jail where he was staying on another matter, isn't that right?" The prosecutor asked for a sidebar to note that defense counsel was "eliciting from our witness the fact that his

client was in jail on an unrelated matter." During this cross-examination, counsel mentioned the fact that defendant was taken from the Cook County jail to be questioned regarding the Oak Park murder at least seven more times. Thus, the jury was already aware that defendant was familiar to law enforcement before Paladines ever took the stand and that awareness was produced by the defense strategy, not by the prosecution.

Given this line of questioning of Cotter and defense counsel's concession that defendant burglarized the victim's apartment on the day of the murder, the effect of Paladines's answer to the prosecutor's question–if indeed the jury made the inference of prior criminal conduct–is minuscule. Thus, any error in the admission of the detective's answer was not a material factor in defendant's convictions. See *Hall*, 194 Ill. 2d at 339. We, therefore, need not consider the State's assertion that the sustained objection and the jury instruction were sufficient to cure any prejudice resulting from the question and Paladines's answer.

## B. *Defendant's Videotaped Statement*

Defense counsel objected to the admission of the entire videotaped statement, arguing that portions of the tape were irrelevant and prejudicial. The trial court overruled the objection, finding that the evidence of other crimes was admissible because it was "part of the continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged." The trial court noted that this result was consistent with the appellate court's decision in *People v. Slater*, 393 Ill. App. 3d 977 (2009) (applying a continuing-narrative exception to the general rule barring admission of other-crimes evidence).

At trial, before the videotape was played for the jury, the trial court noted that it had previously denied defendant's motion *in limine* to bar parts of the videotaped statement in which defendant spoke of other burglaries on the basis that "it was the defendant's statement *** and the entire statement should come into the record." The court stated that it had watched the objected-to portion of the tape and found that the "particular testimony is sufficient to show intent and motive, and therefore balancing it on that issue, between its probative

-20-

value and prejudicial, I believe the probative value would take the position and therefore for those two reasons, I will allow it in."

Defendant argues that the portion of his videotaped statement in which he recounted how he and his girlfriend would commit burglaries was irrelevant and prejudicial and should not have been shown to the jury. He acknowledges that such other-crimes evidence may be used for the purpose of showing intent and motive, but argues that his intent and motive to burglarize the McAvinchey apartment were not at issue. The only possible use the jury might have made of this evidence, he asserts, is to convict him of murder based on his mere propensity to commit burglaries. He also distinguishes *Slater*, arguing that the other crimes referred to in his statement are not sufficiently connected to the charged crime to be admitted under the "continuing-narrative exception" to the propensity rule.

The State responds that the trial court's reliance on *Slater* was correct and that defendant's "brief discussion of the procedures he and Norwood usually employed when they burglarized homes was part of defendant's continuing narrative of how he broke into the victim's home and was in the middle of burglarizing it when the victim returned home and he killed her." In addition, the State argues that a defendant's intent and motive are relevant even when not controverted. According to the State, defendant's description of his usual method of committing burglaries while avoiding getting caught showed that his continuing motive was to obtain property to sell for cash so that he could buy drugs. Finally, the State asserts that even if admission of this small portion of the tape was error, it was harmless error given the overwhelming evidence of defendant's guilt.

In *Slater*, the defendant was charged with the first degree murder of one victim and domestic battery of a second victim, his girlfriend. *Slater*, 393 Ill. App. 3d at 978-79. The evidence showed that on the day of the killing, the defendant was angry with his girlfriend because he thought she had been out with someone else the night before. He punched her in the nose while she was driving her car, causing it to bleed so much that she could not see to drive. *Slater*, 393 Ill. App. 3d at 979. They returned to the duplex they shared so that she could clean her bloodied face. Shortly thereafter, two men arrived in a car. The driver exited the car and approached defendant and his girlfriend on the porch, offering to sell drugs. The driver did not leave the

premises when ordered to do so by defendant, who retrieved a shotgun from the trunk of his car. Defendant fired the shotgun in the air and the driver turned to leave. As he walked back to his car, defendant fired again, hitting the passenger who had remained in the car. He died as a result of a shotgun wound to his face. *Slater*, 393 Ill. App. 3d at 979-80.

On appeal, the defendant argued that counsel was ineffective for failing to object to the joinder of the two offenses. The appellate court resolved this issue by observing that even if the domestic battery charge had been severed from the murder charge, the State could have presented evidence of the domestic battery at the murder trial "under the continuing-narrative exception to the proscription against the admission of other-crimes evidence." *Slater*, 393 Ill. App. 3d at 992. Thus, even if defense counsel had successfully objected to the two charges being tried together, the jury would have heard about the domestic violence incident.

Neither *Slater* nor the parties offer any authority from this court regarding the existence or the scope of a continuing-narrative exception to the propensity rule.

In the case of *People v. Pargone*, 327 Ill. 463 (1927), the defendant and two other men forced their way into an apartment occupied by two women. They demanded money and took a watch from one of the women and then tied the women's hands and feet and laid them on the bed. They also bound a young boy they found hiding in the bathroom and pushed him under the bed. After ransacking the apartment, they took clothing and other personal items and packed them in boxes and suitcases. Eventually, they cut the ropes binding the women and sexually assaulted them. The defendant "had intercourse" with one of the women and "committed the crime against nature" with the other woman. The men then left, carrying away the stolen property. *Pargone*, 327 Ill. at 465. The defendant was convicted of the rape of one of the women.

He argued on appeal that the trial court erred by admitting evidence that he also assaulted the second woman because this was a distinct substantive offense other than the offense with which he was charged. *Pargone*, 327 Ill. at 468. This court held that the rule excluding evidence that a defendant has committed other crimes "applies only to disconnected crimes. If evidence offered has a

-22-

tendency to prove the crime charged it is competent even though it also proves a separate, distinct offense." *Pargone*, 327 Ill. at 468-69. The key fact was that "[a]ll the acts were part of one transaction." *Pargone*, 327 Ill. at 470.

This court used the phrase "continuing narrative" for the first time in *People v. Marose*, 10 Ill. 2d 340, 343 (1957). In that case, this court ruled that the trial court did not err by admitting evidence that a defendant who was charged with rape was driving a stolen car when he abducted the victim or that he forced her to submit to other sexual acts after the rape. "The facts concerning the stolen car and other sexual acts are all a part of the continuing narrative which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes." *Marose*, 10 Ill. 2d at 343. See also *People v. Walls*, 33 Ill. 2d 394, 397 (1965) (evidence that rape defendant and accomplices stole the automobile in which they drove the victim home was properly admitted as part of continuing narrative of " 'circumstances attending the entire transaction' "), quoting *Marose*, 10 Ill. 2d at 343; *People v. Johnson*, 34 Ill. 2d 202, 206 (1966) (in trial of defendant charged with stealing from a sleeping train passenger, testimony that he stole from another sleeping passenger on the same train was part of continuing narrative).

In contrast, other-crimes evidence may not be admitted under the continuing-narrative exception, even when the crimes occur in close proximity, if the crimes are distinct and "undertaken for different reasons at a different place at a separate time." *People v. Lindgren*, 79 Ill. 2d 129, 139-40 (1980) (granting new trial to defendant charged with the murder of his girlfriend's grandfather where State admitted evidence that he set fire to his ex-wife's house six blocks away and one to two hours after the victim was robbed and killed).

Evidence regarding the burglary of the Callahan apartment was properly admitted in this case because it was part of the continuing narrative of the charged murder. However, defendant is correct that his admission that he would "go out from time to time and burglarize" and his description of the technique he regularly employed to do so do not fit this exception. His earlier burglaries were not relevant to the circumstances on the day of the murder.

However, we conclude that even though defendant objected to the admission of these statements, they were relevant for a purpose other

-23-

than showing his mere propensity to commit crimes. These statements were consistent with and tended to support the theory of the defense–that he committed the burglary that day, but left before the murder occurred. Defendant cannot complain that he was prejudiced by his own mention of his other crimes when his admission that he burglarized residences from time to time and had developed means of avoiding detection tended to show that as a burglar, he successfully avoided contact with the residents of the homes he entered. We conclude, therefore, that it was not error for the trial court to admit the challenged portions of defendant's videotaped statement over his objection.

Even if admission of such statements is error, such an error does not necessarily entitle defendant to a new trial. If improperly admitted other-crimes evidence was not a material factor in defendant's conviction, reversal is not required. *Hall*, 194 Ill. 2d at 339.

We find it highly unlikely that the jury was improperly influenced by defendant's brief account of his typical approach to burglary. If anything, his explanation of the efforts he would take to ensure that he would not encounter anyone at home during one of his crimes is consistent with his claim that he is merely a burglar, not a murderer. Further, the evidence of defendant's guilt was overwhelming. Thus, even if it was error to admit portions of defendant's statement, he is not entitled to a new trial on this basis

### III. Eligibility for the Death Penalty

A defendant who is convicted of murder is eligible for the death penalty if he is over the age of 18, the murdered individual was killed in the course of another felony, and the defendant actually killed the murdered individual. 720 ILCS 5/9–1(b)(6)(a)(i) (West 2002).

At the eligibility hearing, the State presented a certified copy of defendant's birth certificate, showing his date of birth as July 29, 1963, making him 40 years old at the time of the murder. The State also presented certified copies of the verdict forms from the guilt phase of the trial, showing that defendant had been convicted of first degree murder (720 ILCS 5/9–1(a) (West 2002)), home invasion (720 ILCS 5/12–11(a)(2) (West 2002)), and residential burglary (720 ILCS 5/19–3(a) (West 2002)). The prosecutor argued that the evidence at

trial proved that defendant was the individual who killed the victim and that after the killing he removed certain items of the victim's property from the apartment.

The trial court found that the State met its burden of proof to show that defendant was 18 years of age or older at the time of the murder. Further, the evidence adduced at trial showed that defendant "in fact, committed the murder, and that, while committing the murder, connected to that murder, were the additional crimes of home invasion, a felony, and residential burglary, a felony." The prerequisites for eligibility for the death penalty "having been proven beyond a reasonable doubt," the trial court found defendant eligible for death penalty sentencing.

Defendant argues in his brief to this court that the conviction for home invasion must be vacated because it was based on the "same physical acts" as the murder and that, as a result, the murder was not committed "in the course of" a separate felony of home invasion. At oral argument, however, counsel conceded that defendant's conviction for home invasion is proper under our decision in *People v. McLaurin*, 184 Ill. 2d 58 (1998) (home invasion is not a lesser-included offense of intentional murder). He argued, instead, that the manner in which the State charged the two crimes in the indictment (alleging that defendant "beat and stabbed" the victim causing her death and that he "beat and stabbed" the victim intentionally causing injury) means that the home invasion conviction based on the same charged conduct may not be used as an aggravating factor at the eligibility phase of a capital sentencing hearing.

He argues further that under the standard established by this court in *People v. Hattery*, 109 Ill. 2d 449 (1985), counsel was ineffective for conceding at trial that he committed the felony of residential burglary.

Defendant's commission of murder in the course of either felony provides a sufficient basis for the trial court's finding that defendant was eligible for the death penalty. See *People v. Williams*, 193 Ill. 2d 306, 362-63 (2000). Thus, if either of defendant's two arguments fails, the other argument need not be addressed by this court. We choose to address the issue regarding counsel's performance.

Generally, a claim of ineffective assistance of counsel is analyzed

-25-

under the two-part test set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). However, the *Strickland* court noted that some circumstances are so likely to cause prejudice to the accused that prejudice will be presumed. *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067, citing *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). Where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.

This court applied the *Cronic* analysis in *Hattery*, finding that the defendant had been denied effective assistance of counsel. Hattery was convicted of the murders of a woman and her two children. He had been ordered by Mister, a leader in the street gang to which both men belonged, to remain with the victims in their apartment while Mister took their husband and father on an unsuccessful search to buy drugs. Mister told the defendant that if he did not return in five minutes, he knew "what to do." Hattery understood that he was to kill the woman and her children. He waited longer than five minutes, but he did follow Mister's instructions. *Hattery*, 109 Ill. 2d at 453-55. The evidence against Hattery was overwhelming, and included a transcribed statement in which he admitted the murders. *Hattery*, 109 Ill. 2d at 454-55.

Defense counsel conceded during opening argument that Hattery had killed the three victims, but argued that he did so because Mister would kill his mother and sisters if he refused to follow Mister's orders. *Hattery*, 109 Ill. 2d at 458. Counsel told the members of the jury that he did not expect them to find his client not guilty of murder and that he did expect them to find him eligible for the death penalty. Counsel argued that "the only question facing" the jury was whether to impose the death penalty on a killer who was trying to save the lives of his own family members. *Hattery*, 109 Ill. 2d at 459.

During trial, defense counsel attempted to develop, through cross-examination, evidence that the defendant was compelled by Mister to kill the victims. Otherwise, counsel presented no theory of the defense, presented no evidence, and chose not to make a closing

statement. *Hattery*, 109 Ill. 2d at 459. The defendant's attorneys also conceded that his statement confessing to the murders was truthful and mentioned at several points during the guilt phase of trial that this was a "death penalty case." The prosecutor's closing argument emphasized the fact that defense counsel conceded the defendant's guilt. *Hattery*, 109 Ill. 2d at 460.

This court concluded that counsel's "unequivocal" concession of his client's guilt, when Hattery had pleaded not guilty, resulted in the State's case not being "subjected to the 'meaningful adversarial testing' required by the sixth amendment." *Hattery*, 109 Ill. 2d at 464, quoting *Cronic*, 466 U.S. at 656, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045. In addition, certain comments by defense counsel "further impressed upon the jury the false notion that the guilt or innocence of the defendant was not at issue but, rather, had already been decided." This strategy was not unreasonable, given the facts, but "was totally at odds with defendant's earlier plea of not guilty." Thus, this strategy should not have been pursued without the defendant's consent. *Hattery*, 109 Ill. 2d at 464-65. This court reversed defendant's murder convictions on the basis that the defendant was denied his right to the effective assistance of counsel. *Hattery*, 109 Ill. 2d at 465.

Defendant argues that he was similarly denied the effective assistance of counsel.

At the guilt phase of trial, the attorney presenting defendant's opening argument began: "On July 31st, 2003, Rodney Adkins committed a burglary at the home of Catherine McAvinchey." She further stated that after defendant rummaged through her apartment, taking jewelry and other items, "then what he did was left." She acknowledged that the physical evidence, including fingerprints and DNA, placed him at the scene of the murder, but argued that no physical evidence, such as hair or fibers, connected him to the murder weapon or to the body of the victim. She concluded by saying that "the physical evidence in this case will show you that Rodney Adkins committed a burglary, but this evidence does not show that he committed murder."

Defense counsel thoroughly cross-examined the State's witnesses. The proprietor of the pawn shop where defendant sold jewelry the afternoon of the murder acknowledged that he saw no blood on defendant's clothing. Hoskins did not find any blood on the duffle bag

or the computers he bought from defendant. The officer who recovered the duffle bag from Hoskins saw no blood on the bag or its contents. The assistant medical examiner acknowledged on cross-examination that DNA or other evidence may be transferred from an attacker to a victim "in close proximity" to each other and that no such evidence was found on the victim's body.

Other cross-examinations established that the State Police DNA analyst did not swab or test the handle of the murder weapon when she tested the bloodstain on the blade. She did not test fingernail clippings from the victim for DNA or examine the black duffle bag for bloodstains. She agreed that she could not determine when a particular DNA sample was deposited.

Defense counsel questioned Paladines regarding photographs of defendant taken after he gave the videotaped statement. The photographs were taken to show that he had no injuries. Paladines acknowledged that such photographs would not show if any "mental coercion or anything like that" had happened to the defendant.

Counsel also questioned both Cotter and Paladines regarding the fact that Norwood was not charged in this case, suggesting that they believed defendant's confession was false, at least to the extent that it implicated Norwood in the burglary and murder. Assistant State's Attorney Santini also acknowledged that the only person charged with this murder was defendant. However, the trial court sustained the State's objections to all other questions regarding his decision not to charge Norwood and his belief or nonbelief in the truth of defendant's statement.

The defense rested without calling any witnesses.

In closing argument, defense counsel told the jury that "a deliberate and dispassionate examination of the evidence" would show that "Rodney Adkins committed the residential burglary of Cathy McAvinchey's home, but he did not see her, he did not come in contact with her, and he did not murder her." Counsel repeatedly emphasized the fact that no physical evidence connected defendant to the murder weapon or to the victim's body–there was no evidence of him on her; no evidence of her blood on him. Counsel described his client as a drug addict who stole to support his habit, but who was not a murderer, and called the jury's attention to unidentified fingerprints

in victim's home, pointing out that the police did not attempt to lift fingerprints from the sink or faucet handles to see who else might have rinsed blood from the knife.

Counsel argued further that defendant's videotaped statement was false, emphasizing the fact that defendant's statement implicated Norwood, yet she was not charged. If his statement were true, counsel argued, Norwood would have been charged. Thus, the "reasonable inference is that Oak Park and the State's Attorney do not believe that Romanette Norwood was there when the murder happened." The court sustained the State's objection to this comment.

Counsel characterized the portions of the statement regarding the burglary as true and noted their detail. In contrast, counsel argued, the portions of the statement regarding the alleged murder were lacking in detail or were inaccurate (for example, defendant said that there was little blood at the scene). This, he suggested, indicated that the police "fed" defendant details of the murder so that he would include them in his statement. According to counsel, it was noteworthy that defendant's statement did not mention his smoking a cigarette at the scene. This omission, he suggested, occurred because the police did not learn until much later that the cigarette butt found in Callahan's apartment contained defendant's DNA.

In conclusion, counsel reiterated the theme of the defense: "If he left behind evidence of a residential burglary, why wouldn't he leave behind evidence of a murder?" Counsel reminded the jury of the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt.

In its rebuttal, the State responded to counsel's argument regarding the fact that Norwood was not prosecuted by stating that defendant was trying to deflect some of the blame for his own crimes onto his girlfriend and that the only evidence that put Norwood at the scene was defendant's own statement.

Citing this court's decision in *Hattery*, defendant now argues that this entire strategy was flawed because "[i]f it failed and the jury convicted [defendant] of the murder, he had no defense to his eligibility for the death penalty because of counsel's concession that [he] had committed residential burglary." He attempts to distinguish this court's decision in *People v. Johnson*, 128 Ill. 2d 253 (1989), on

the basis that the defendant in that case attempted to use *Hattery* to attack his conviction, not his sentence. Defendant explains that he is not arguing that the strategy was ineffective at the guilt phase, but that "counsel needed his consent for that strategy because of [its] effect on the eligibility phase of the proceedings," because this concession, standing alone, was sufficient to make him eligible for the death penalty once the jury found him guilty of murder.

In *Johnson*, this court addressed a defendant's claim that his trial counsel was presumptively ineffective under *Cronic* and *Hattery*. The defendant had been fired from his job and he returned to the workplace to confront his former manager over unpaid wages to which he thought he was entitled. After he was refused, he left and returned with a gun. He shot the manager and another employee several times and ordered a second employee to lie on the floor. He took a wallet from the manager's body. He took cash and car keys from the second employee and shot him twice, then took additional cash from his pocket. When he saw that the second employee was still moving, he stabbed him with a knife. The first employee died from two gunshot wounds to the chest. The manager and the second employee survived their injuries and testified at trial. After his arrest, the defendant told officers where they could find the murder weapon. He also gave police a written statement, which was admitted into evidence at trial. *Johnson*, 128 Ill. 2d at 259-61.

The theory of the defense was that although the defendant committed murder and other crimes, he did not commit murder in the course of an armed robbery. Thus, defense counsel conceded guilt to murder, but contested the armed robbery and felony-murder charges. This strategy was based on counsel's assessment that the evidence on the intentional-murder charge was overwhelming, but that if the defendant were found not guilty of felony murder, he would not be eligible for the death penalty. *Johnson*, 128 Ill. 2d at 262.

Defense counsel conceded during his opening statement that the defendant committed the murder, but argued that he did so before he decided to take property from the victim. The issue, according to counsel, was not whether the defendant committed murder, but whether he committed felony murder. During trial, defense counsel cross-examined the surviving victims, attempting to elicit testimony that the defendant did not enter the store with the intent to rob them.

-30-

*Johnson*, 128 Ill. 2d at 264-65. The defense presented no witnesses. In closing argument, counsel again admitted defendant's guilt of the murder, but reiterated the claim that defendant took the money and other property as "an afterthought" and that, therefore, the State had not proven beyond a reasonable doubt that he committed the murder in the course of an armed robbery. *Johnson*, 128 Ill. 2d at 265. The defendant was convicted of felony murder and other charges and sentenced to death.

This court distinguished this trial strategy from the one employed in *Hattery*, where counsel "made an unequivocal concession to the murder charge, the only charge brought against the defendant," and where counsel conceded eligibility for the death penalty. *Johnson*, 128 Ill. 2d at 267-68. In *Johnson*, there "was asserted a theory of defense to a number of charges, not just a theory of mitigation, and this theory was pursued during opening and closing arguments and during cross-examination." *Johnson*, 128 Ill. 2d at 270. Although counsel conceded his client's guilt of murder, "going to trial did preserve for the defendant matters that a guilty plea necessarily would have waived." *Johnson*, 128 Ill. 2d at 270. In addition, counsel did not abandon even the pretense of defending his client; rather, counsel argued that the State was required to meet its burden of proof beyond a reasonable doubt and that it had not done so. *Johnson*, 128 Ill. 2d at 270.

Because we found *Hattery* inapplicable, this court then conducted the two-part *Strickland* analysis for ineffective assistance of counsel and, without deciding the first prong, concluded that in light of the overwhelming evidence, the defendant suffered no prejudice from the claimed errors. *Johnson*, 128 Ill. 2d at 271.

In the present case, defendant does not make a claim under *Strickland*. Neither party briefed this issue. At oral argument, defendant admitted that given the strength of the State's case, it would be difficult for him to meet the prejudice prong.

He argues instead that counsel's strategic choice at the guilt phase, although it might have been a reasonable trial strategy, deprived him of his right to demand that the State prove his eligibility for the death penalty beyond a reasonable doubt. Thus, defendant argues, the question presented is whether under our decisions in *Hattery* and *Johnson* he was deprived of his right to an adversarial hearing at the eligibility phase because counsel conceded his guilt of residential

burglary at the guilt phase.

The State responds that counsel did not concede defendant's guilt on all charges, as occurred in *Hattery*; rather, counsel vigorously contested the murder charge even while acknowledging that the evidence of defendant's guilt of residential burglary was overwhelming. Further, because eligibility for the death penalty did not become an issue until after defendant was found guilty of murder, the State argues that counsel's trial strategy was reasonable.

We find that the present case more closely resembles *Johnson* than it does *Hattery*. Defendant's attorneys did not concede that he was guilty of murder; they did subject State's case to meaningful adversarial testing; and they did present a theory of the defense.

The evidence convincingly demonstrated that defendant committed the burglary of McAvinchey's apartment. Defense counsel recognized that there were only three possible explanations for what happened on that July day: either defendant broke into an apartment in which the resident had just been murdered, or he committed the murder in the course of the burglary, or he left the apartment with stolen property and the resident was murdered by someone else almost immediately thereafter. Counsel likely found the first scenario unworthy of belief because a person who discovered a murder scene during a burglary would likely flee rather than remain to complete the crime and leave behind evidence that could incriminate him in the murder. Thus, the theory pursued by the defense was that the mere possibility of the third scenario created reasonable doubt of defendant's guilt.

Counsel also had to contend with defendant's videotaped statement, which admitted both the burglaries and the murder. Attempts to exclude the statement were unsuccessful. Thus, the attorneys representing defendant recognized that to avoid a conviction for murder, they had to not only explain the physical evidence, they had to discount defendant's incriminating statement. The only reasonable way to address the physical evidence–DNA on the cigarette butt, fingerprint on the bottle, and the stolen goods either pawned, sold, or given away by the defendant–was to admit that he had committed the burglaries. Counsel also argued zealously, but unsuccessfully, that defendant's statement was not worthy of belief because he was either lured or pressed in to making the statement.

Defendant does not suggest an alternative theory that might have been pursued at trial and, indeed, he admits that this theory was a reasonable approach at the guilt phase, given the evidence against him. He argues that even though he was well represented at trial, the failure of the defense strategy deprived him of a meaningful hearing on the question of death eligibility. He cites our decision in *People v. Mata*, 217 Ill. 2d 535 (2005).

In *Mata*, a defendant whose death sentence had been commuted to a sentence of natural life in prison challenged the statutory aggravating factor that had been used to find her eligible for the death penalty. Had she not been found death-eligible, she would have been sentenced to a term of years with the possibility of eventual parole. Thus, even though her death sentence was commuted, she was still subject to the effects of the finding of eligibility. *Mata*, 217 Ill. 2d at 542-43. Her argument on appeal was that the State had not proven the statutory aggravating factor of commission of murder in "a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means" (720 ILCS 5/9–1(b)(11) (West 1998)) beyond a reasonable doubt. *Mata*, 217 Ill. 2d at 539.

The issue was governed by the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In *Ring*, the Court noted that the aggravating factors that allow imposition of the death penalty operate as " 'the functional equivalent of an element of a greater offense.' " *Ring*, 536 U.S. at 609, 153 L. Ed. 2d at 577, 122 S. Ct. at 2443, quoting *Apprendi*, 536 U.S. at 494 n.19, 147 L. Ed. 2d at 457 n.19, 120 S. Ct. at 2365 n.19. Under these rules, *Mata* was entitled to claim that the evidence of the aggravating factor was insufficient, despite the commutation of her death sentence. The matter was remanded to the appellate court for consideration of the merits of her appeal. *Mata*, 217 Ill. 2d at 550-51.

Defendant offers *Mata* as support for his argument that because

a statutory aggravating factor is the "functional equivalent" of an element of the offense of capital murder, defense counsel's conceding existence of any one of the charged aggravating factors amounted to a guilty plea "to a new offense" without his consent to such a plea. At oral argument, counsel used the expression that trial counsel had "pleaded guilty to eligibility."

*Mata* does not support this argument. The constitutional right at stake in *Apprendi*, *Ring*, and *Mata* was the sixth amendment right to trial by jury–to have each element of each offense proved to an impartial jury beyond a reasonable doubt. The constitutional right at stake in *Cronic*, *Hattery*, and *Johnson* was the sixth amendment right to the effective assistance of counsel. Defendant does not make an *Apprendi*-based argument.

Even under the *Apprendi* line of cases, no error occurred. At the beginning of the sentencing phase, the State moved to readmit all evidence presented at trial. The motion was granted. Defendant's eligibility for the death penalty was shown to the trial court–an impartial finder of fact–by overwhelming evidence that he was interrupted by the victim while in the act of burglarizing her apartment and that he killed her to avoid being identified. Thus, the finding of eligibility for the death sentence did not violate *Apprendi*, *Ring*, or *Mata*.

In sum, defendant has not demonstrated that trial counsel was presumptively ineffective under *Cronic* and *Hattery* and has not argued prejudice under *Strickland*. Thus, he was properly found eligible for the death penalty based on his commission of murder in the course of a residential burglary.

## IV. Right of Confrontation at Second Phase of
## Sentencing Hearing

During the second phase of the sentencing hearing, over defense counsel's objection, the State was permitted to admit into evidence the affidavit of Steven Farrell Dozier, former director of the Arkansas State Police. The affidavit stated that in 1986, Dozier had been an investigator in the criminal investigation division of the state police. He assisted a local police department in the investigation into the origin and cause of a house fire. Property had been stolen from the

premises. In his opinion, the fire had been set to cover the crimes of burglary and theft. He subsequently interviewed defendant, who was in custody in Tennessee awaiting extradition to Arkansas to face other charges. Defendant confessed to the break-in and the theft of property, but initially denied setting the fire. He also admitted to another break-in and theft earlier the same day. Defendant consented to the search of the room that he occupied in his mother's home. The stolen property from the two homes was found in his room. In addition, other stolen property was recovered from individuals who stated that they purchased the items from defendant. Defendant pleaded guilty to burglary, theft, and arson and was sentenced to 20 years' imprisonment, with 12 years suspended.

The State also called Cook County Assistant State's Attorney Jamie Santini, who testified that on September 10, 2003, he interviewed Romanette Norwood, defendant's girlfriend, at the Oak Park police department. Norwood was advised of her rights and signed a *Miranda* waiver. After several hours of questioning, she consented to have her statement videotaped. The tape and a transcript of her statement, which is summarized above, were admitted into evidence and the tape was played for the court.

Defendant notes, correctly, that the Dozier affidavit and the Norwood statement are hearsay. Thus, he argues, his sixth amendment right to confront the witnesses against him was violated by admission of these items of evidence because he did not have the opportunity to cross-examine either declarant.

This court has long held that hearsay evidence is admissible at the second phase of a capital sentencing hearing so long as the evidence is relevant and reliable. *People v. Free*, 94 Ill. 2d 378, 423 (1983). This standard was called into question by the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203, 124 S. Ct. 1354, 1374 (2004), which held that the hearsay statement of a witness who is unavailable at trial may not be admitted against a criminal defendant if the statement is testimonial in nature, unless the defendant has had a prior opportunity to cross-examine the witness regarding the statement. *Crawford* did not consider whether the confrontation clause of the sixth amendment is applicable at the aggravation/mitigation phase of a capital sentencing hearing.

We answered this question in *People v. Banks*, 237 Ill. 2d 154, 203 (2010), holding that the confrontation clause does not apply at the second phase of a capital sentencing hearing and reaffirming the standard of relevance and reliability.

At the second phase of a capital sentencing hearing, the ordinary rules of evidence are relaxed so that the jury and/or the trial court may have the fullest information possible with respect to the defendant's life, character, criminal record, and the circumstances of the particular offense. *People v. Kliner*, 185 Ill. 2d 81, 171 (1998). As noted, the only requirement for the admissibility of evidence at this phase of a capital sentencing hearing is that the evidence be relevant and reliable. This determination rests within the sound discretion of the trial court. *People v. Caffey*, 205 Ill. 2d 52, 125 (2001).

In the present case, the contents of the Dozier affidavit were both relevant and reliable. The affidavit provided the court with accurate information taken from official records regarding defendant's long criminal history, evidence that tends to negate one of the statutory mitigating factors. See 720 ILCS 5/9–1(c)(1) (West 2002) (the fact that a defendant has no significant history of prior criminal activity may be used as a mitigating factor).

Defendant argues that Norwood's statement was not reliable because his own statements to the police implicated her in the burglary and murder and, thus, he argues, she had a "powerful incentive to place all of the blame" on him. He cites *Lee v. Illinois*, 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526, 106 S. Ct. 2056, 2062 (1986), for the proposition that the natural desire to exonerate oneself when talking to the police makes the statement of a codefendant presumptively unreliable.

*Lee* is inapposite. In that case, the defendant challenged the admission of a codefendant's confession as substantive evidence against him at trial in a noncapital case. At that time, a hearsay statement could be admitted against a criminal defendant without violating the confrontation clause so long as the statement met an exception to the hearsay rule and the statement was sufficiently reliable to warrant its "untested admission." *Lee*, 476 U.S. at 539, 90 L. Ed. 2d at 525, 106 S. Ct. at 2061, citing *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 607, 100 S. Ct. 2531, 2538-39 (1980), abrogated by *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d

177, 124 S. Ct. 1354 (2004). The Court held in *Lee* that the codefendant's statement "as the confession of an accomplice, was presumptively unreliable and that it did not bear sufficient independent 'indicia of reliability' to overcome that presumption." *Lee*, 476 U.S. at 539, 90 L. Ed. 2d at 525, 106 S. Ct. at 2061.

In the present case, Norwood is not a codefendant and her videotaped statement was not a confession. She was not charged with any crime in connection with the burglary and murder. Other than her frank admission to illegal drug use and assisting defendant in some earlier burglaries, the only evidence that might have implicated her in the crimes of which defendant was accused was her possession of the stolen watch, sunglasses, and eyeglasses. Her explanation that defendant gave these items to her is entirely plausible. In addition, no physical evidence connects her to the crime scene and there is no evidence at all of more than one intruder. All of the evidence is consistent with her version of the events, including defendant's use of the black duffle bag and the sale of the stolen computers to Hoskins. The only suggestion that she was involved in any way was made by defendant. Thus, it is defendant who attempted to shift some of the blame to Norwood, perhaps in an effort to undermine her credibility if she should testify as a witness against him. We conclude that the trial court did not abuse its discretion in admitting her statement, which was sufficiently reliable, relevant to his conduct in the immediate aftermath of the brutal murder and his mental state in the days following, and tended to show his lack of remorse.

### V. Death Penalty as Excessive Sentence

Defendant argues that the death penalty is excessive, given his impoverished and neglected childhood, his nonviolent criminal history, his drug addiction, his work history, and the fact that he has been a model prisoner since his arrest for this crime. He asserts that a life sentence would permanently protect society from his actions in the future and asks this court to vacate his death sentence and remand for a new sentencing hearing at which a lesser sentence will be imposed.

The State points to the viciousness of the crime, defendant's lack of remorse, and other evidence in aggravation, including the fact that he was on mandatory supervised release at the time of the murder, and

argues that this evidence far outweighs the "paucity of evidence in mitigation." Thus, the State asserts, the trial court reached the proper and just conclusion when it sentenced defendant to death and this court should affirm the sentence.

The applicable statute provides that this court "may overturn" a death sentence, without respect to any procedural ground for reversal or trial error, if we find that the death sentence is "fundamentally unjust as applied to the particular case." 720 ILCS 5/9–1(i) (West 2008). Thus, "[w]hen requested to do so, this court reviews the evidence in a capital sentencing hearing to determine whether death is the appropriate penalty, even in the absence of trial error." *People v. Thompson*, 222 Ill. 2d 1, 36 (2006). Because the second phase of a death penalty hearing is "a process of evidentiary balancing," which requires the trier of fact to assess the credibility of the witnesses, we will not lightly overturn the trier of fact's decision. *Thompson*, 222 Ill. 2d at 35. However, we will conduct a "thorough and careful review, considering the circumstances of the crimes and the character of the defendant to determine whether the death penalty is appropriate." *Thompson*, 222 Ill. 2d at 36. Our goal is to "ensure that only those deserving of the ultimate penalty are so sentenced." *Thompson*, 222 Ill. 2d at 35.

Because of the "intense scrutiny" (*Thompson*, 222 Ill. 2d at 35) required, we summarize the evidence of aggravating and mitigating factors in detail.

At the eligibility phase hearing, the State moved to readmit all of the evidence and exhibits that were utilized at trial. The court noted that it was allowed to consider all such evidence and exhibits in sentencing and, without objection by the defendant, allowed the motion. Thus, the facts and circumstances of the crime, described above, were properly considered in sentencing.

The State began its case in aggravation with a summary of defendant's extensive criminal history. His first conviction for burglary occurred in Illinois in 1981. He was 18 years old. He was sentenced to 18 months' probation, but violated probation less than 4 months later and was sentenced to 3 years' imprisonment.

Seven months after he was paroled, he was convicted of attempted felony burglary in Tennessee and sentenced to one year in prison.

Later, while on parole for this offense, he was convicted of a carrying a dangerous weapon and again given probation.

At age 24, he was convicted in Arkansas of burglary, theft, and arson and given a 21-year sentence, with 12 years suspended. Four years later, he was out of prison and again convicted of burglary and sentenced to five years' probation.

In 1993, he pleaded guilty to theft in Illinois and was sentenced to four years' imprisonment. He was released in 1995. Nineteen months after his release, he pleaded guilty to residential burglary and arson and was sentenced to 15 years' imprisonment. His guilty pleas to two additional residential burglary charges resulted in two additional 15-year concurrent sentences. He was released from prison on June 12, 2002.

He was still on mandatory supervised release on July 31, 2003, when he committed the murder of which he now stands convicted. He was charged with five additional residential burglaries after he was convicted in the present case. Defendant stated to the probation officer who prepared the presentence investigative report that he had been "out in the world" for a total of three years between the time he was 17 and when, at age 40, he murdered Catherine McAvinchey.

Elizabeth Touhy Masterson testified that on August 28, 2003, she was a medical student, living alone in an apartment in Forest Park, Illinois. At approximately 5 p.m. on that date, she returned home, entering the apartment through the kitchen door. She found plastic grocery bags strewn about the kitchen. On entering the living room, she saw that the front door had been kicked in and her stereo, CD player, suitcases, and other items were spread on the living room floor. In her bedroom, the dresser drawers had been pulled open. She left the apartment and called 911. Several pieces of heirloom jewelry had been taken, along with newer jewelry, her flute, her CDs and DVDs, some liquor, and some cash. Later, she visited several pawn shops in an effort to locate some of her belongings. She found a necklace that had belonged to her great aunt and her flute, which was identified by a serial number, at a pawn shop in North Riverside, Illinois. She did not locate any of the other stolen items. Defendant was eventually arrested and charged with the burglary of Masterson's apartment. That case was pending at the time of the sentencing hearing.

Detective Juan Paladines of the Oak Park police department testified regarding a burglary that occurred on June 24, 1993. The door to the residence had been forced open and jewelry valued at over $10,000 was taken. That same day, an intruder forced open the door of another residence, but fled when he saw that the occupants were at home. Another similar burglary occurred in Oak Park on July 15, 1993. The door was forced open and a coin collection was stolen. Defendant subsequently pleaded guilty to two counts of theft for these crimes.

Detective Roger Grivetti of the Oak Park police department testified that he investigated a burglary that occurred on February 9, 1995. After the victim left for work in the morning, the rear door of his house was kicked in. The house was ransacked and jewelry, currency, and other items were stolen. Latent fingerprints were recovered and one was identified as belonging to defendant.

Grivetti also investigated a residential arson that occurred on February 15, 1995. The occupant of the house encountered defendant on her front porch as she was leaving for work. He claimed to be responding to an advertisement placed by a person named Roberts. She told him that she had not placed such an ad and continued on to work. When she returned home, she discovered police and firefighters on the scene. A fire had extensively damaged the first floor of her home. A search revealed that the door had been kicked in and the upstairs ransacked. A gold watch and fur coat were among the items taken. A latent fingerprint taken from a safe in an upstairs bedroom matched the defendant. The fire was started by a burning cigarette left on a couch. One member of the household was a smoker, but he did not smoke in the home and he used a different brand from the cigarette butt recovered from the couch.

On February 17, 1995, Grivetti investigated another burglary. After the resident left for work, the front door of her residence was kicked in and the house was ransacked. Jewelry and pocket watches were taken, along with a Sony Walkman and some currency. Defendant was arrested that afternoon and the stolen items were found on his person, as well as a watch that had been taken during the February 15 burglary and arson. Defendant pleaded guilty to the three crimes investigated by Grivetti and was sentenced to three concurrent terms of 15 years' imprisonment.

The Dozier affidavit was admitted at this point. The contents of the affidavit are summarized above.

William Ballard, a patrol sergeant with the Oak Park police, testified that he had been involved with the investigations of the murder of Catherine McAvinchey and other crimes committed by defendant, for which charges were then pending. He testified regarding a residential burglary that occurred 10 days after the murder. The back door of the apartment was kicked in, the apartment was ransacked, and items were stolen. In addition, one week after the murder, another burglary occurred in which the door was kicked in and computers, DVDs, and jewelry were taken. One of the stolen computers was recovered from the same individual who purchased the murder victim's laptop. Finally, on August 25, 2003, the back door of another home was kicked open, a DVD player, VCR, and a cable box were stolen. The cable box was recovered from defendant's residence.

Michael Keating, a sergeant with the Forest Park police, testified that he had been trained as an evidence technician and that he collected evidence at the scene of a residential burglary on August 27, 2003. The front door of the apartment had been kicked in and the apartment was in disarray. Jewelry, a VCR, a computer, and a backpack filled with medical textbooks were taken. A shoe print on the door was upside down, "like somebody had mulekicked" the door. Defendant was charged with that crime and charges against him were then pending.

The following day, Keating was called to another crime scene, the Masterson apartment. He observed and documented the same "upside down" shoe print on the door. The shoe print was distinct, with crisscrosses and a shield in the center of the pattern and appeared to be from a K-Swiss brand shoe.

Some of the stolen items from these two crimes were subsequently recovered from a pawn shop in North Riverside. Surveillance photographs showed the defendant and his mother, Fanny Roberts, as the individuals who pawned the items. The pawn slips that were obtained from the pawn shop contained the names of defendant and Roberts. Keating recovered a latent fingerprint from a recovered CD player that had been taken from Masterson's apartment. The Illinois State Police Crime Lab made a positive identification of defendant from that print.

-41-

Keating contacted the K-Swiss company and spoke to a product design manager, who provided a picture of a shoe that made the print Keating described. A pair of white K-Swiss shoes matching the picture and the shoe prints was recovered from defendant's bedroom. When defendant was arrested in connection with these two crimes, he admitted committing both burglaries.

The court also viewed Norwood's videotaped statement, which was introduced via the testimony of Assistant State's Attorney Santini. The contents of that statement are summarized above and will not be repeated here.

The State's final witness was Patrick McAvinchey, brother of the victim. He identified several photographs of his sister and a written victim impact statement that he had prepared, which were admitted into evidence. He read the statement aloud.

Defendant's first witness in mitigation was his mother, Fanny Roberts. She testified that she had a 40-year history of mental illness, but she did not know her diagnosis. She was raped by defendant's father when she was 13. He was her "boyfriend" for several years. Defendant was born when she was 17. When defendant was two years old, she married Walter Roberts, who did not like having defendant around. A year later, she gave birth to a daughter, Felicia, whom she has not seen in 17 years. Fanny, Walter, and Felicia moved to California, leaving defendant with her mother. They returned five years later. Eventually, she and Walter divorced and she moved to Chicago, bringing defendant with her. She testified that he was polite and intelligent and that he had taken care of her when she was ill. However, he had gotten in with the wrong crowd and was a "different person when he does drugs."

On cross-examination by the State, she stated that she would occasionally pawn her own jewelry or items for defendant. He told her that the flute she pawned had been given to him by the man he worked for at one time, Omar Karim. She identified herself in the photograph from the pawn shop, but denied that the man standing behind her was defendant. She denied having called the police on several occasions because defendant had been violent towards her, insisting that he took good care of her. She also denied telling an employee of forensic clinical services that defendant killed the family cat when he was 10 years old or that he was unable to control his temper.

Defendant also called Pearl Pugh, Fanny Roberts' sister. She testified that her sister had been diagnosed as schizophrenic and that she had been "in and out" of the hospital as a result of her mental illness. She described a family history of mental illness, with more family members being ill than not. As a child, defendant did not know his biological father, but did eventually meet him in prison. Defendant began drug use when he was very young, introducing Pugh's children to "reefers." Before he was on drugs, he was "a nice person to know," but after he started using drugs he began "robbing and stealing." After his 2002 release from prison, he was involved with a church for about six months. Then he reunited with Romanette Norwood and they began doing drugs together and "the whole thing started over, the robbing and stealing." Pugh visited defendant in jail regularly during the four years between his arrest and trial. She felt that he had "changed an awful lot," and said that he was involved in Bible study and prayer meetings.

Alvin Hill testified that he was a mitigator in the office of the Cook County public defender. He prepares mitigation reports for the purpose of presenting defendants "in their true light *** who they are beyond the crime they are charged with." Over the State's hearsay objection, Hill was allowed to testify to the contents of the report he prepared after reviewing defendant's school and prison records, as well as numerous sources of information regarding mental health, recidivism, and criminology in general. He also interviewed defendant's cousin, an aunt, an uncle, former coworkers, his mother, his biological father, his mother's former husband, a pastor, and an official with the Arkansas Department of Corrections.

Hill learned that defendant was born when his mother was still a teenager and that she had been involved with an older man, Clyde Harris. Harris admitted "messing around" with her, but denied any sexual abuse. Their relationship continued for several years, until she became pregnant with defendant. She later married Walter Roberts, who resented her illegitimate child and insisted on leaving him behind when the family moved to California. Defendant moved into his grandmother's home, where approximately 20 relatives were living, most of them children whose parents were not present. The home was "effectively fatherless." According to defendant and one of his aunts, two young uncles sexually abused them both. Defendant dropped out

of school as a 15-year-old seventh grader. The two IQ scores contained in his grammar school records are 76 and 83.

Hill testified that defendant's first interaction with his biological father was when he was about 13 years old and he talked his way into a dice game being played by several men, including Harris. Later, both defendant and Harris were in the same jail awaiting trial and spent several hours together, but did not discuss their relationship. Harris was convicted in 1987 of conspiracy to commit murder.

According to the information gathered by Hill, defendant's only male role model was an older cousin, who introduced him to marijuana at age 12 and suggested that he make some money by selling it at school. By age 13 or 14, defendant was using cocaine and heroin. His drug of choice as an adult has been crack cocaine.

Hill further testified that in addition to his mother's diagnosed schizophrenia, several other family members suffered from what they referred to as "their affliction," apparently schizophrenia. Defendant's half-sister, Felicia, also had substance abuse and mental health problems. She disappeared at age 19 and has not been heard from since. The family believes that she is dead because she was a "drug runner."

Hill summarized defendant's criminal history, beginning at age 10 when he was caught stealing a toy from a store and "officially" at age 17 when he was arrested for possession of marijuana. Although defendant has spent the vast majority of his adult life in prison, he has never been convicted of armed robbery, battery, or assault.

According to Hill, defendant's mother also has a criminal record. She worked as a house cleaner and stole from the homes of her employers. She spent some time in prison in California as a result. She also committed fraud by receiving welfare or other assistance from three states simultaneously.

Hill documented that after his release from prison in 2002, defendant was employed by the Illinois Department of Human Services as a caregiver for a paraplegic man, Omar Karim. Karim had since died, but Hill spoke to defendant's coworkers, who described his work with Karim as "absolutely stellar." Defendant cooked for Karim, bathed and dressed him, and cleaned his apartment. There were no allegations that he stole from Karim or abused him in any way.

Finally, Hill testified regarding defendant's conduct while incarcerated. Hill reviewed records from every prison in which defendant has been held. The records show that defendant has been "a model detainee." He has never threatened or injured a corrections officer or other inmate. As a result of good behavior, he has been given additional responsibilities, such as being a trustee or serving as a barber. In the four years defendant spent in the Cook County jail awaiting trial for the murder, he was not given a single disciplinary ticket. Hill opined that the likelihood of future violence by defendant if he is in a locked facility is "remote."

On cross-examination, the prosecutor questioned Hill regarding his description of defendant's grades while in school and caused him to acknowledge that he had misspoken when he said that a C was the highest grade defendant had ever earned. The prosecutor also questioned Hill regarding the reported IQ scores. Hill did not know which particular IQ test was administered to defendant. In addition, the prosecutor called into question Hill's statement that defendant had been addicted to narcotics since the age of 12 or 14 when he has spent the majority of his adult life in prison.

Defendant was allowed to make a statement, without cross-examination. His statement was long and rambling in parts. In sum: he asked for compassion and mercy; he questioned whether justice would be served by killing him; he was "saddened" by the "disparities" in proceedings where "color alone is the sole factor" for seeking the death penalty; he claimed that the "supervisor of the prosecution office *** illegally collected evidence and testified unethically" at his trial; he admitted that he was "flawed," but insisted that he was not "evil"; he described the work he did with Karim; he questioned the constitutionality of the death penalty; he described his transformation from "a broken man without spirit" to someone who found "God's grace" while incarcerated; he asked that those who felt anger toward him find forgiveness; he accused the State of erasing tapes; and he asserted that the law has "two standards," one for the rich and one for the poor and that he was a victim of this disparity.

His statement minimally acknowledged his responsibility for the brutal murder of Catherine McAvinchey. At one point, he claimed to be "remorseful to all parties involved," although this remark was addressed as much to his family members as to the victim's family. He

offered "a special message for the victim's family," in which he talked about the power of "adversity" to "make us better" and told them that "grief and sorrow will always pass in time." Defendant asked the victim's mother to "find the strength to forgive me without judging," and he claimed to have felt her pain and heartache and to be "living [her] loss." He told her that "you will forever be a part of my life in remembrance of sins committed against you and your family."

The prosecutor's closing argument focused on the circumstances of the crime, contrasted with defendant's lack of remorse, noting that his statement to the court revealed that he "thinks this thing is only about him." She reviewed the details of the crime, emphasizing the brutal manner in which defendant beat, stabbed, and sawed at the flesh of a woman who was totally incapacitated and who was in no way an obstacle to his escape from the scene of what, until he attacked her, was a simple burglary. She recounted the last moments of Catherine McAvinchey's life from her point of view and noted that defendant was so unaffected by what he had done that he took some of the stolen money, bought a lottery ticket, and then partied with the winnings. Within a matter of days, defendant resumed committing burglaries, apparently unconcerned that he might encounter another resident at home.

The prosecutor then examined each of the statutory mitigating factors, one by one, and concluded by arguing that while the defendant had offered some evidence of mitigation, the mitigation evidence should carry "little or no weight" and that it was not sufficient to preclude imposition of the death penalty.

Defense counsel acknowledged that the crime committed by defendant was "horrific," but urged the court not to impose the death penalty because defendant is not the "worst of the worst." He is not a serial killer, or a sexual predator, or a drug kingpin wiping out witnesses to protect his business. In 2003, defendant was "a pathetic crack-head thief." Counsel referred to defendant's childhood and his model behavior while in prison. Counsel argued that "[s]ociety does not have to kill Rodney Adkins to protect itself from him," and that if he is imprisoned for life he might eventually "see that it wasn't about him, it wasn't about his skin, but it was about what he did." Counsel also argued that the victim's family would have closure if he were sentenced to natural life in prison, but not if he were to sit on death

row for years, filing appeals and obtaining stays of execution.

The State responded that the death penalty is not reserved for the "worst of the worst," but is to be imposed on defendants who have been found eligible for the death penalty if the factors in aggravation are not outweighed by the mitigating factors. The mitigation in this case "barely exists." The brutality defendant inflicted on the victim belies his claim that he is not violent. His repeated crimes of residential burglary and arson demonstrate a willingness to do violence to others. After killing the victim, he committed at least three more residential burglaries, only the residents "were lucky enough not to be there." Defendant has shown no remorse for what he did; he asks for mercy when he gave no mercy.

Noting that it had reviewed and considered the evidence at trial, the evidence at the sentencing hearing, the contents of the presentence investigation, defendant's statement, and the arguments of counsel, the trial court found there was not sufficient evidence of mitigation to preclude the death penalty. The court imposed a sentence of death for the murder and concurrent sentences of 30 years and 15 years for home invasion and residential burglary. The court denied defendant's subsequent motion to reconsider sentence.

Before this court, defendant argues that although he is guilty of multiple burglaries, he attempted to burglarize only residences where he was sure no one was at home. He claims that before he kicked in the door of Catherine McAvinchey's apartment on July 31, 2003, Norwood rang the doorbell repeatedly to ensure that no one was at home. He points to the evidence of his difficult childhood and to the lack of evidence that he had ever injured anyone prior to killing the victim in this case. Finally, he argues that the "most important" evidence in mitigation was that he functioned extremely well in prison and would not be a danger to anyone if sentenced to "a substantial term of imprisonment." He cites several cases in which this court has vacated a sentence of death and urges us to do the same in this case.

The State responds by again detailing the viciousness of the crime and the horror felt by the victim as she lay paralyzed, helpless to defend herself as defendant beat and stabbed her, sawing at her neck so viciously that he nearly decapitated her. He has shown "absolutely no remorse" and his long criminal history includes the forcible felony of arson (720 ILCS 5/2–8 (West 2002) (defining "forcible felony" to

include arson)) and the inherently violent crime of residential burglary (720 ILCS 5/9–1(b)(6)(c) (West 2008) (defining "inherently violent crime," for purpose of consideration as an aggravating factor for capital sentencing, to include residential burglary)). He continued to commit residential burglaries after the murder, apparently willing to risk the possibility of encountering another victim at home. Multiple past imprisonments have not rehabilitated him. Finally, his recent good behavior while incarcerated should be viewed with skepticism, especially because the murder was committed when he was on mandatory supervised release. This brutal crime reveals how the defendant behaves when he feels that there is no way out. He can maintain a facade of compliance only so long as he has the possibility of release. A sentence of natural life in prison without the possibility of parole would remove the only thing reining in his violent impulses.

In his reply brief, he disputes the State's description of the violence of the murder, arguing that the evidence shows only eight bruises and eight abrasions on the victim, as opposed to the "dozens" of bruises and abrasions mentioned by the State. He argues that the evidence does not support the State's assertion that the victim was "extensively beaten" and notes that the pathologist testified that these injuries "could be" consistent with being punched and beaten, not that they were necessarily caused by being punched and beaten. Similarly, he disputes the evidence that the knife wound on the victim's hand was evidence that she was conscious and desperately trying to defend herself from the knife attack. He characterizes the pathologist's testimony that the wound "could be" a defensive wound and that it was "a possibility" that the victim's hand was injured while she tried to ward off the attack as "equivocal" and "inconclusive."

The six cases cited by defendant in which this court has vacated a sentence of death based on the character of the offender and the circumstances of the offense (*Thompson*, 222 Ill. 2d at 36) offer no support for his argument that the death sentence is excessive in this case.

In *People v. Smith*, 177 Ill. 2d 53 (1997), the defendant was a woman who hired another to kill the wife of her married lover. Although the victim was killed in a brutal manner in front of her minor children, the defendant had no past criminal record and the record was replete with evidence of her good character. She had become pregnant

and her lover broke his promise to leave his wife for her. She acted out of jealousy and rage, in the belief that if the wife were gone, her problems would be solved. As abhorrent as her crime was, this court concluded that her involvement in the murder was "an aberration brought on by special circumstances, which in all likelihood will not be repeated." *Smith*, 177 Ill. 2d at 101.

In *People v. Blackwell*, 171 Ill. 2d 338 (1996), the defendant was visiting friends in Joliet, where he had lived before his older brother was killed by gang members and he and his family moved to Mississippi. He had no criminal record, no history of violence, and no prior gang involvement. He carried a gun, however, because of his fear of gangs. He and his friends attended a party where they unexpectedly encountered a group of gang members. A fight broke out. As they tried to leave, he pulled his gun and fired 14 shots into the group of gang members, killing four people and wounding two. As serious as his crimes were, this court concluded that the death penalty was inappropriate because of his relatively blameless life prior to this one explosive episode. *Blackwell*, 171 Ill. 2d at 364.

In *People v. Leger*, 149 Ill. 2d 355 (1992), the defendant was an emotionally unstable man who, five days before their divorce was to be final, murdered his estranged wife. He then drove to a neighboring county and shot his former wife and her new husband, killing her and wounding him. He had a history of serious medical problems resulting from a workplace injury in which he lost both legs. His mental state was affected by the combination of his prescription medications and alcohol. He had no history of serious criminal activity, aside from two battery convictions related to marital discord, and his background, prior to his injury, included excellent military and work records. Under these circumstances, this court found the death sentence to be excessive. *Leger*, 149 Ill. 2d at 411.

In *People v. Johnson*, 128 Ill. 2d 253 (1989), the defendant was fired from his job, for a reason he thought unfair. He was drinking when he phoned his former employer to inquire about picking up his final paycheck and was told that there was no check for him. He used drugs that afternoon and carried a gun. It was in this condition that he decided to go back to his employer's to get "his due." When his former supervisor said he had no money for him, the defendant pulled his gun. The supervisor dared him to shoot. He killed one man and

injured two others. Prior to that time, the defendant had been a good student and a reliable employee. He had no history of violence and he expressed remorse for his crimes. This court concluded that he was not "the type of person who should be permanently eliminated from society." *Johnson*, 128 Ill. 2d at 281. In fact, one of his surviving victims testified on his behalf, stating that he should not be put to death and that if he had died, he would have wanted one of the other men to argue that death was not appropriate. *Johnson*, 128 Ill. 2d at 282.

In *People v. Buggs*, 112 Ill. 2d 284 (1986), the defendant and his wife argued after one of her boyfriends persistently called their home. During the argument, the wife told defendant that he was not the father of two of their sons. He became enraged, pouring gasoline on his wife and the stairway. He lit a match and fled. His wife and one child died in the resulting fire. The defendant had no prior history of serious criminal activity. He had served honorably in the military for 21 years. Finally, if not for the marital dispute that triggered "this tragic sequence of events," he "would presumably be leading a life acceptable to our society." *Buggs*, 112 Ill. 2d at 295.

*People v. Carlson*, 79 Ill. 2d 564 (1980), was factually similar to *Buggs*, except that the defendant killed not only his ex-wife, but also a police officer. He was sentenced to a term of 50 to 100 years for the murder of his ex-wife and to death for the murder of the officer. Carlson and his ex-wife were planning to reconcile when she informed him that she had a new boyfriend. Later, he drove by the home they had previously shared and saw an unfamiliar car in the driveway and he considered setting fire to the house. When he learned that she had become engaged to the boyfriend, he shot her multiple times and set fire to the house. He went to a bar and began to drink. Several hours later, three police officers and an assistant State's Attorney came to arrest him. When confronted, he pulled a gun from his waistband and began firing. One of the officers later died of bullet wounds to the chest. *Carlson*, 79 Ill. 2d at 572-73. In vacating that sentence, this court noted that the defendant had no significant history of prior criminal activity and that the murder of his wife, which occurred only hours before the shooting of the officer, was not prior criminal activity. Rather, both killings were "part of one unfortunate and tragic event." *Carlson*, 79 Ill. 2d at 588. In addition, the defendant had

suffered two heart attacks and several serious injuries requiring surgery in the two years prior to the crimes. He had "deteriorated physically and emotionally" and he was no longer capable "of leading a complete and fulfilling life for a man in his early forties" and was "extremely distraught." *Carlson*, 79 Ill. 2d at 589. In addition, after killing his wife, the defendant was nevertheless concerned about his family and tried to contact his adult daughter to give her money for the support of his minor son. *Carlson*, 79 Ill. 2d at 590. This court concluded that these "mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society." *Carlson*, 79 Ill. 2d at 590.

In contrast to these cases, defendant has an extensive criminal record. He cannot claim to have led a relatively blameless life, or to have been reacting to a perceived threat of physical violence. He killed a helpless woman, who could not have prevented him from fleeing the scene. Defendant points to no aspect of his character that in any way mitigates his responsibility for this brutal murder. He was under no particular emotional stress and was not reacting to any personal trauma such as the end of a marriage or the loss of a job. Rather, he murdered an innocent person who interrupted his crime, rather than flee and risk the possibility that she might be able to identify him. The scant evidence of mitigation in the present case does not sufficiently preclude imposition of the death penalty given defendant's extensive criminal history and the brutal and vicious nature of his crime.

In sum, we have carefully reviewed the record in light of the seven specific mitigating factors listed in the statute. The first factor does not apply because defendant has a significant history of prior criminal activity. 720 ILCS 5/9–1(c)(1) (West 2002). The second factor does not apply because defendant did not commit the murder while under an extreme mental or emotional disturbance. 720 ILCS 5/9–1(c)(2) (West 2002). Factors three, four, and five are ruled out by the facts and circumstances of this case. The victim was not a participant in the defendant's crimes and she did not present a threat of death or harm to him. 720 ILCS 5/9–1(c)(3), (c)(4), (c)(5) (West 2002). Defendant's background, while unstable and underprivileged, did not include extreme emotional or physical abuse. 720 ILCS 5/9–1(c)(6) (West 2008). Defendant, while uneducated, does not suffer from reduced mental capacity. 720 ILCS 5/9–1(c)(7) (West 2008).

The statute also instructs us to consider any other facts relevant to mitigation. Among the authorities cited by defendant to argue that the death penalty is excessive in this case are *Skipper v. South Carolina*, 476 U.S. 1, 5, 90 L. Ed. 2d 1, 7, 106 S. Ct. 1669, 1671 (1986) (eighth amendment violated by exclusion of evidence of defendant's good behavior in jail at capital sentencing hearing), and *Jurek v. Texas*, 428 U.S. 262, 275, 49 L. Ed. 2d 929, 940, 96 S. Ct. 2950, 2957-58 (1976) (when considering sentence of death, sentencing authority must consider defendant's probable future conduct if imprisoned).

Evidence that a defendant has been a model prisoner does not preclude imposition of the death penalty. In *People v. Ballard*, 206 Ill. 2d 151, 189 (2002), the defendant argued that his good behavior while in prison demonstrated his rehabilitative potential. This court noted that "good behavior in prison need not offset otherwise substantial aggravating evidence against the defendant." *Ballard*, 206 Ill. 2d at 189. Quoting *Skipper*, this court observed that " '[O]ne arrested for a capital crime, and particularly a convicted defendant awaiting sentencing, has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life. Good behavior in those circumstances would rarely be predictive as to the conduct of the prisoner after sentence has been imposed.' " (Emphasis omitted.) *Ballard*, 206 Ill. 2d at 189, quoting *Skipper*, 476 U.S. at 14-15, 90 L. Ed. 2d at 13, 106 S. Ct. at 1676 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

In the present case, the court received evidence of defendant's conduct while incarcerated as required by *Jurek*. The trial court gave this evidence little weight compared to the aggravating factors.

Before this court, defendant argues that he would not present a danger to other inmates or to prison personnel if he were to be given a life sentence, pointing not only to his four years of good behavior while jailed awaiting trial for murder, but to the records of his several previous prison terms that demonstrate his full compliance with the routine of prison life. However, the State aptly notes that in all past imprisonments, defendant has had a strong incentive to be on his best behavior–the possibility of early release and parole. Indeed, defendant has never been sentenced to the maximum sentence for any crime and has never served the full term to which he was sentenced. If faced

with the reality of a sentence of natural life in prison and the certainty that he will die there, the incentive for good behavior would evaporate. We, therefore, find that the trial court need not have given this evidence any greater weight.

After careful review of the record and of the circumstances of the crime and the character of the defendant, we conclude that the death penalty is the appropriate penalty in this case. We, therefore, affirm the sentence imposed by the trial court.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and death sentence. We direct the clerk of this court to enter an order setting Tuesday, March 15, 2011, as the date on which the sentence of death shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2002). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.