2026 IL App (1st) 231104-U

No. 1-23-1104

Filed March 4, 2026

Third Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 5897 |
| | ) | |
| TERRY GILFORD, | ) | Honorable |
| | ) | Gregory P. Vazquez, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*: Evidence was sufficient to prove defendant guilty of first degree murder and concealing a homicidal death beyond a reasonable doubt. Trial counsel was not ineffective for failing to request certain jury instructions. Prosecutor's comment during opening statements on incriminating DNA evidence, which was later excluded, was not misconduct. Trial judge's comments toward defense counsel did not deprive defendant of a fair trial.

¶ 2     Following a jury trial, Terry Gilford was convicted of first degree murder and concealing a homicidal death and sentenced to an aggregate term of 65 years in prison. We affirm.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4          Alaina Jones began dating Garcel Woods in late 2016. On the night of January 25, 2017, she and Woods visited his mother. Afterward, they joined Jones's friend Paula at Paula's home on South 12th Street in Maywood, Illinois. Paula resided with her boyfriend, Jimmy, and members of his family, including his cousin, Gilford, who Jones knew by the nickname Tik.[2] Jones and Woods joined Paula and Jimmy in their basement to socialize. Sometime later, Gilford entered the basement and greeted everyone. He went upstairs and returned a short time later carrying a plate of food. Gilford asked if anyone was hungry. Woods, whom Jones believed to be inebriated and in an agitated mood, "jumped up" and responded, "Hell no!" Initially, Jimmy and Gilford told Woods to relax, but Woods and Gilford began punching each other. Woods removed his shirt and the fighting continued. Jimmy was able to calm Woods briefly, but he remained agitated and resumed fighting with Gilford. At some point, Woods struck his head on a door frame and fell to the floor. Eventually, Gilford and Woods exited through a basement door that led outside to the driveway. Jones went outside and observed the two facing each other. A "spark" came from Gilford's arm, which was pointed at Woods, followed by a loud bang. Woods exclaimed, "S***! I quit!" Seconds later, there was another spark and bang. Woods stumbled and fell to the ground. Jones ran to him and found that Woods was bleeding from his chest. Jones called for the others to help. Gilford told her to leave. Jones entered her vehicle and drove to her home in Joliet, Illinois.

¶ 5          Later that night, Jones called Paula to inquire about Woods. Paula informed her that Woods was "all right" and had left. The following day, Woods's shirtless body was found in an open field under elevated train tracks on Chicago's South Side. He had sustained two gunshot wounds to the chest, which was determined to be the cause of his death. Jones's debit card was found in Woods's

_____

[2]The record does not include Paula's or Jimmy's last name.

pocket. Chicago Police Detectives spoke with Woods's mother, Shirley Van Buren, who informed them that he and Jones had visited her the prior evening. Van Buren stated that Jones called her and told her she left Woods at Paula's house after she and Woods had an argument. Woods thought Jimmy was flirting with her. Jones did not tell Van Buren about the fight with Gilford or that Woods had been shot.

¶ 6 Jones learned through Facebook that Woods had died. Investigators came to her home in Joliet on January 27, but her father sent them away. On January 29, Jones met Chicago detectives at a Joliet police station. She agreed to be transported to a Chicago police station, where she gave a videotaped statement relaying her account of the shooting. She identified Gilford in a photo array as the person who shot Woods.

¶ 7 Lena Jackson, a self-described "nosy neighbor," lived next door to Paula, Jimmy, and Gilford. On the night of January 25, 2017, she heard a loud noise, which she likened to a gas explosion, coming from the direction of their house. A second "boom" followed, and Jackson now believed that she had heard gunshots. From her window, she observed Gilford speaking with Jones, telling her to go home. Eventually, Jones entered her vehicle and drove away. Several people emerged from the house. Chris, who is Jimmy's mother and Gilford's aunt, directed them to return indoors. Gilford remained outside. Jackson observed him pulling something, but she could not see what it was. The pulling made a sound, however, that reminded Jackson of the sound made when she pulls a tarp loaded with dirt to her garden.

¶ 8 Gilford sat on the front porch for about 20 minutes. Then, his son, Trevon, arrived, driving a gray SUV, which he parked on the street. Gilford pulled what he had been dragging to the driver's side of his own tan SUV, which was parked on the driveway. Gilford appeared to place what he had been dragging into the rear seat and attempted to close the door but was unable to do so.

Gilford then went to the rear of his SUV and lowered a hatch. He pulled some more and closed the door. Gilford and Trevon entered their respective vehicles and drove southward. Both vehicles turned left at the end of the block, in the direction of an entrance to the Eisenhower Expressway (Interstate 290).

¶ 9    Jackson did not call police to report what she had seen. She estimated that she had previously called the police 50 times about Gilford or his family members for various reasons. Jackson had recently resolved not to call anymore because she was "tired of calling the police." In addition, she knew the occupants of Gilford's house would be "out of there" due to a pending foreclosure. Most recently, Jimmy had driven across her lawn. On a prior occasion, another relative had threatened to shoot her. Her primary complaint, however, was her belief that Gilford and his son were selling drugs. She described the scene as "like a McDonald's. You could drive by and get everything but french fries."

¶ 10    Blood stains were discovered on Gilford's driveway and the basement wall. Each were consistent with Woods's DNA profile. A blue tarp was found in the garbage can at Gilford's residence. Two blood stains were on the tarp, but DNA analysis revealed neither were from Woods. Ashes from charcoal had been spread across the driveway. Historical cell site location information for Gilford's cell phone indicated the phone traveled from the area of his residence to the South Side of Chicago and back again between midnight and 1 a.m. on January 26, 2017.

¶ 11    Gilford did not testify or present any evidence. The jury found him guilty of both first degree murder and concealment of a homicidal death. The jury also found Gilford had personally discharged a firearm that proximately caused death. The court sentenced Gilford to 60 years in prison for first degree murder and a consecutive five-year term for concealment of a homicidal death. This appeal followed.

¶ 12                                    II. ANALYSIS

¶ 13        Gilford raises four issues on appeal. First, Gilford challenges the sufficiency of the evidence. Second, he claims his trial counsel was ineffective for failing to request certain jury instructions. Third, Gilford claims he was prejudiced when the prosecutor stated his DNA was found under Woods's fingernails. And finally, he argues the trial judge's hostile remarks toward defense counsel deprived him of a fair trial.[3]

¶ 14                            A. Sufficiency of the Evidence

¶ 15        When reviewing the sufficiency of the evidence, we must determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25. All reasonable inferences from the evidence must be drawn in favor of the prosecution. *Id*. We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*.

¶ 16        Gilford contends the evidence was too weak to prove him guilty beyond a reasonable doubt. He argues that the sole eyewitness, Jones, was not credible: she did not report the incident and gave differing explanations—being scared and thinking it unnecessary; she did not mention the fight or that Woods had been shot when she spoke to his mother; and none of the other people who were present testified to corroborate her account. Gilford also claims Jackson was not credible: she had a longstanding bias against him; she called the police on dozens of occasions to report accusations against him yet failed to report his role in an apparent murder; and she only gave her account when police questioned her. As for other evidence, Gilford notes: the only bloodstains

_____

[3]We address the issues in a different order than Gilford's brief presents them.

found on the tarp did not belong to Woods; no blood or DNA was discovered inside his vehicle; and the historical cell site location information was not precise. Last, Gilford avers that the State's proffered motive for murder—that Gilford killed Woods because of Wood's reaction to his offer of food—is improbable and unreasonable. Instead, Jones's testimony that Woods grew agitated because he perceived Jimmy was flirting with her offers a more probable and reasonable motive for Jimmy to have killed Woods.

¶ 17     We are unpersuaded that the evidence was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of Gilford's guilt. His arguments go to Jones's and Jackson's credibility and possible inferences to be drawn from the evidence. But it was for the jury, as the trier of fact, to assess the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). The jury also resolves conflicts or inconsistencies in the evidence. *Id*. "A conviction will not be reversed simply because the defendant tells us that a witness was not credible." (Internal quotation marks omitted.) *Id*. Likewise, an assertion that another person could have committed the offense does not necessarily raise a reasonable doubt as to the guilt of the accused. *Id*. at 429. We will not substitute our judgment for the jury's on questions involving the weight of the evidence or the credibility of the witnesses. *Id*. at 428. Since Gilford's arguments address functions of the jury and not this court, his challenge to the sufficiency of the evidence is unavailing.

¶ 18                         B. Failure to Request Jury Instructions

¶ 19     Next, Gilford claims his trial counsel was ineffective for failing to request jury instructions regarding a witness's prior inconsistent statement, evidence of other crimes, and assessment of an eyewitness's identification. Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard established in *Strickland v. Washington*, 466 U.S. 668

(1984). *People v. Johnson*, 2021 IL 126291, ¶ 52. To prevail, a defendant must demonstrate (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance resulted in prejudice. *Id*. To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. Counsel's decisions regarding jury instructions are generally a matter of trial strategy, immune from claims of ineffective assistance. *People v. Smith*, 2025 IL App (1st) 220116, ¶ 34. But "the failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission den[ied] the right of the accused to a fair trial." (Internal quotation marks omitted.) *Id*.

¶ 20        The State asserts Gilford failed to provide a sufficient record to enable review of this claim and forfeited the claim by failing to argue that he was prejudiced. We disagree. In a memorandum accompanying Gilford's motion for new trial, defense counsel recounted that the instructions at issue were not requested because the off-the-record jury instruction conference was rushed. In ruling on the motion, the court stated that it gave the parties the opportunity to address jury instructions before trial. The court also noted that the defense did not request the instructions and was raising the issue for the first time after trial. Thus, the record establishes that trial counsel did not request the instructions cited in this claim. In addition, we find the claim is not forfeited, as Gilford's brief does assert that he was prejudiced by counsel's failure to request the instructions.

¶ 21        Gilford's claim regarding an instruction on prior inconsistent statements is rebutted by the record. The transcript reveals the court did, in fact, instruct the jury in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014), which informs jurors they may consider that a witness made a statement inconsistent with their trial testimony for the limited purpose of deciding the weight to be given their testimony. Therefore, this claim is meritless.

¶ 22    Next, Gilford contends counsel should have requested that the jury be instructed in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal 3.14), which instructs jurors to consider evidence of the defendant's involvement in offenses other than those charged only for the limited purpose for which such evidence was admitted. The instruction should have been given, he argues, since Jackson testified that Gilford was involved in drug dealing. We observe that this testimony was elicited during cross-examination. On direct, Jackson only stated that she had called the police "50 times" but did not give specifics as to the reasons or to whom the calls pertained.

¶ 23    IPI Criminal 3.14 accords with the other crimes doctrine. "Evidence that a defendant has committed crimes other than the one for which he is on trial may not be admitted for the purpose of demonstrating his propensity to commit crimes." *People v. Adkins*, 239 Ill. 2d 1, 22-23 (2010). "Such evidence, however, may be admitted for a proper purpose such as proving *modus operandi*, intent, identity, motive, or absence of mistake." *Id*. at 23. But the other crimes doctrine and IPI Criminal 3.14 contemplate instances where *the State* elicits evidence of other crimes for a proper purpose. See *People v. Ware*, 2019 IL App (1st) 160989, ¶ 40 ("[E]vidence of other crimes is admissible when it is relevant to a fact material to the prosecution."). Here, *the defense* elicited testimony during Jackson's cross-examination that Gilford was involved with illegal drugs, incidentally to its effort to demonstrate Jackson's bias toward him. That is, the defense elicited that Jackson had a lengthy history of calling the police on Gilford and accusing him of crimes. Accordingly, defense counsel argued in closing that Jackson should not be believed since she was biased against Gilford and wanted to implicate him in a murder so he would no longer be living next door. Thus, the record demonstrates the evidence of Gilford's involvement in other crimes was not elicited for any of the purposes contemplated in the other crimes doctrine or IPI Criminal

3.14. Gilford cites no authority to support that IPI Criminal 3.14 is applicable in similar circumstances.

¶ 24    Yet, even if IPI Criminal 3.14 were applicable, the issue was not so critical to the defense that its omission denied Gilford a fair trial. There was no evidence elicited or allegation made suggesting that Woods's killing was connected to illegal drugs. The evidence was relevant only for the collateral purpose of probing Jackson's credibility. And Jackson only made a few brief references to illegal drugs. An instruction could have risked drawing more attention to it and amplifying Gilford's propensity to commit crimes.

¶ 25    Last, Gilford argues counsel should have requested Illinois Pattern Jury Instructions, Criminal, No. 3.15 (approved July 28, 2017) (hereinafter IPI Criminal 3.15) regarding the circumstances of identification. In his brief on appeal, Gilford asserts that the defense's "theory was that he was not present." Thus, he contends: Jones's and Jackson's identifications were critical; the evidence showed their identifications were unreliable; and, therefore, the jury should have received IPI Criminal 3.15, instructing them how to assess the identifications.

¶ 26    The record refutes this argument. The defense's theory was not that Gilford was not present. Rather, the defense argued that Woods's shooting did not occur on South 12th Street in Maywood. In closing, defense counsel asserted that Woods left that location with Jones and the shooting she claimed to have observed on the driveway never happened. Instead, defense counsel argued, Woods was killed somewhere else.

¶ 27    Accordingly, identification was not an issue in this case. IPI Criminal 3.15 contemplates instances where it is undisputed that a witness observed the crime and perpetrator but the reliability of their identification of the defendant as the perpetrator is at issue. To be sure, the first factor for the jury to consider—the opportunity the witness had to view the offender at the time of the

offense—reveals the assumption that the witness observed both the offense and offender. Here, by contrast, it was disputed whether Jones or Jackson observed the crime and perpetrator. Indeed, the issue was whether the events they claimed to have observed occurred at all. Thus, IPI Criminal 3.15 simply did not apply. For that reason, Gilford was not prejudiced by the lack of this instruction.

¶ 28    In sum, we find Gilford has not established that his trial counsel was ineffective for failing to request these jury instructions.

¶ 29                          C. Prosecutorial Misconduct

¶ 30    Next, Gilford claims he was prejudiced when the prosecutor's opening statement asserted that the State would present evidence of his DNA found under Woods's fingernails, but the State failed to present such evidence. During its case in chief, the State sought to present expert testimony regarding the comparison of DNA profiles obtained from Woods's fingernails and a buccal swab from the inside of Gilford's cheek. But the court excluded the testimony when the State informed the court that the officer who took Gilford's buccal swab was unavailable. For that reason, the court found the State could not lay a proper foundation for the comparison. On appeal, Gilford argues the State's mention of the DNA match in its opening statement was made in bad faith, since the State was aware that the officer who took the buccal swab was unavailable, and, therefore, knew they would be unable to present the evidence at trial.

¶ 31    "[I]t is improper for counsel to make opening statements about testimony to be introduced at trial and then fail to produce that evidence." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). "It is not, however, necessarily grounds for reversal that an opening statement refers to evidence which later proves to be inadmissible." *People v. Smith*, 141 Ill. 2d 40, 64 (1990). "Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the

prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *Kliner*, 185 Ill. 2d at 127.

¶ 32　　　　The State contends Gilford forfeited this issue. Although he included the issue in his motion for a new trial, he failed to make a contemporaneous objection during the prosecutor's opening statement. In general, a defendant must both object at trial and present the issue in a written posttrial motion. *People v. Williams*, 2022 IL 126918, ¶ 48. Failure to do either results in in forfeiture. *Id*. The two-part nature of the claimed error—reference to testimony in an opening statement followed by the failure to present such testimony—makes us question whether it is even possible to object during the opening statement. Here, the claimed error was not yet apparent since the testimony was determined to be inadmissible after opening statements. Gilford asserts the claim is preserved, but asks that if we find the issue forfeited, we consider it for plain error. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (setting forth the circumstances in which an unpreserved issue may be reviewed for plain error). We need not resolve whether this issue was properly preserved since the threshold inquiry is to determine whether any error occurred at all. *Williams*, 2022 IL 126918, ¶ 49. If not, the defendant cannot obtain relief, regardless of whether the error was preserved. *Id*. ("[T]he defendant cannot obtain relief on an unpreserved error under the plain-error doctrine if he would not have been entitled to relief on the same error if preserved.")

¶ 33　　　　We do not find that the prosecutor's comment on DNA evidence was attributable to deliberate misconduct. The record contains a report confirming that an expert did, in fact, conclude that Gilford's DNA profile was consistent with the profile from Woods's fingernails. In addition, despite the unavailability of the officer who took Gilford's buccal swab, the State made extensive arguments for the admission of the testimony. The State also attempted to locate other officers who were present when the swab was taken. Further, the State pointed to circumstantial evidence to

prove the buccal swab was taken from Gilford. The transcript from his arraignment showed: Gilford was physically present; the court ordered him to submit to a buccal swab; the court explicitly informed him that a swab would be taken before he left; and the sealed package that was later examined was labeled as being Gilford's buccal swab from the date of his arraignment. Thus, the record demonstrates that the State intended to present the DNA testimony and made a good faith, though unsuccessful, effort to introduce it. Thus, Gilford has not shown the prosecutor commented about DNA evidence with knowledge that it would not be admitted later.

¶ 34    To be sure, the admissibility of the testimony was not certain at the time of opening statements. The admission of DNA evidence at trial is a matter left to the discretion of the trial court. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 70. But it does not necessarily follow that the court would have abused its discretion if it had admitted the DNA evidence here. See *People v. Witherspoon*, 379 Ill. App. 3d 298, 310 (2008) (a trial court's finding under abuse of discretion standard of review does not necessarily mean an opposite finding would be an abuse of discretion). Thus, although the State was aware of the reason the trial court ultimately relied on to exclude the DNA evidence, we cannot presume that the State necessarily knew the trial court would rule as it did.

¶ 35    Additionally, we are unpersuaded that the comment resulted in substantial prejudice. The comment was isolated, stated among a list of other expected testimony, and there was no further reference to Gilford's DNA being under Woods's fingernails at trial. Further, the court properly instructed the jury that opening statements were not to be taken as evidence and jurors are presumed to follow the court's instructions. See *People v. Sutton*, 353 Ill. App. 3d 487, 505 (2004) (finding no substantial prejudice resulted from improper comments in opening statement and closing argument for similar considerations).

¶ 36                                    D. Judicial Comments

¶ 37        Last, Gilford contends he was denied a fair trial when the trial judge made comments reflecting negatively on his counsel in the jury's presence.[4] The State argues Gilford forfeited this issue by failing to include it in a posttrial motion. Gilford's posttrial motion, however, referenced each of the statements he cites on appeal in arguing that the court's comments amounted to prejudicial error. The State's forfeiture argument appears to derive from the heading for this issue in Gilford's brief, which states as follows: "Defendant was denied his right to a fair and impartial jury where the trial judge repeatedly insulted defense counsel and made comments suggesting defense counsel was inept and delaying the proceedings, causing, the jury to disrespect defense counsel and, in turn, defendant."[5] Gilford's posttrial motion did not frame the issue in terms of the right to a fair and impartial jury. Nevertheless, we look to the substance of a claim, not its label. *Betts v. City of Chicago*, 2013 IL App (1st) 123653, ¶ 12. In substance, Gilford's posttrial motion and appellate brief both claim the trial court's comments denied him a fair trial. Accordingly, we find the issue was preserved.

¶ 38        "[A] trial judge must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party." *People v. Sims*, 192 Ill. 2d 592, 636 (2000). "A hostile attitude toward defense counsel, an inference that defense counsel's presentation is unimportant, or a suggestion that defense counsel is attempting to present a case in an improper manner may be prejudicial and erroneous." *People v. Harris*, 123 Ill. 2d 113, 137 (1988).

            "[F]or comments by the trial judge to constitute reversible error the defendant must show

            that the remarks were prejudicial, and that he or she was harmed by them. [Citation.] Where

_____

[4]Gilford was represented by two attorneys. We refer to them collectively as counsel or defense counsel, except where indicated.

[5]This is not a clear and concise issue statement, as required by the Illinois Supreme Court Rules. See Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020).

it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed. [Citation.] *** "[I]n each case an evaluation of the effect upon the jury of a trial court's interjections must be made in the light of the evidence, the context in which they were made and the circumstances surrounding the trial. [Citation.]" *People v. Williams*, 209 Ill. App. 3d 709, 718-19 (1991).

¶ 39        Gilford claims several exchanges during trial demonstrate the trial court's hostility toward defense counsel. First, when cross-examining an evidence technician, counsel showed the witness a series of photographs. For the first photograph, counsel asked whether it was a fair and accurate depiction. She did the same for the next photograph. The court interjected, asking, "Is there any objection to the admission of these photos, State?" The State answered, "no." The court added, "Because then she doesn't have to ask the same question over and over and over. *** So they're in evidence. You don't have to, you know, go through all that." Moments later, counsel referenced another photograph. The court interjected again to ask the prosecutor whether the State objected to its admission. After the prosecutor answered, "no," the court told defense counsel, "Ok, so you don't have to ask any questions." Gilford asserts that the court's comments were insulting and suggested defense counsel was wasting the jury's time.

¶ 40        The admission of exhibits into evidence is within a trial court's discretion. *People v. Dresher*, 364 Ill. App. 3d 847, 861 (2006). When it appears unlikely the opposing party would dispute admission of evidence, it is common for a trial judge to seek the parties' stipulation to its admission. Such a stipulation promotes expedient proceedings, as it relieves the party offering the evidence from having to establish a foundation for its admissibility. In our view, that was the trial court's intention here. It would have been preferable, however, for the court to have simply

informed counsel, upon the State's agreement to their admissibility, that it was unnecessary to lay a foundation for the photographs. But saying counsel "doesn't have to ask the same question over and over and over" or "go through all that," risked implying that counsel's presentation was unimportant or improper. Jurors may misconstrue these remarks, as laypeople cannot be expected to be familiar with rules of evidence or understand that the court was referring to foundational questions. Nonetheless, we are unpersuaded this exchange had a prejudicial effect or were a material factor in the jury's verdict. The comments were isolated and the photographs at issue were not critical to the defense's theory.

¶ 41      Later, when cross-examining a detective, defense counsel asked the witness about an audio recording of his interview with Jones. The prosecutor objected and stated the basis for his objection. Defense counsel began to respond but was interrupted when the court stated, "You know, I'm going to let her get into it, because I want to get through this. The pizza is here. *** We're going to try to get through the witness quickly before it gets to be frozen pizza." Gilford argues the court's comments again suggested that defense counsel was wasting time and diminished the importance of the cross-examination by indicating they just needed to "get though" the witness before the jury's pizza got cold.

¶ 42      It would have been preferable for the court to have simply overruled the objection. The additional comments were unnecessary. But again, we do not find these comments prejudicial. The record demonstrates that the court made similar comments and referred to pizza for the jurors during the State's examination of a witness.

¶ 43      At another point, when cross-examining Jackson, defense counsel asked her why she had not contacted the mayor of Maywood, who lived on the same block, about the shooting. Jackson

replied, "Why would I?" The prosecutor objected. The court then stated, "She's answered. Why would she? Why call the president? Why call the senate? Go ahead. She answered."

¶ 44   Gilford asserts that these comments were improper and suggested that the line of questioning was ridiculous. We agree. The court could have simply overruled the objection without further comment. However, we are unpersuaded that this comment was prejudicial. Defense counsel successfully elicited that Jackson did not report what she claimed to have seen until police questioned her and despite her admitted history of reporting on her neighbors, even for minor issues. Whether Jackson had spoken to the mayor was cumulative of a point the defense had well established.

¶ 45   In addition to those exchanges, Gilford cites several comments the court added when overruling some of defense counsel's objections. These include: "It's just identification testimony. It's admissible;" "She's making a conjecture, but it's obvious to the jury that she says I don't know. So, the objection is overruled. Just keep moving;" "Overruled. He's trying to have her state a direction. Like is it going towards the city, towards this, that, the other. There's nothing prejudicial about him doing it. Go ahead;" "That's why the objection is overruled. He didn't get into anything;" and "Well, it's overruled, because all she did is say they asked." Gilford contends some of the rulings were incorrect and the added comments were belittling, suggesting defense counsel did not understand rules of evidence.

¶ 46   We find the comments cited to be ordinary explanations of the court's evidentiary rulings. Such explanations, even if critical of defense counsel, are not considered improper. See *People v. Minter*, 2015 IL App (1st) 120958, ¶ 122.

¶ 47   Finally, a contentious exchange occurred during a sidebar conference. One of Gilford's attorneys, Ms. Kimble, requested the sidebar to address an attempt to impeach Jackson with a prior

inconsistent statement. Before Ms. Kimble spoke, however, the prosector raised an objection. The court addressed the prosecutor first and the discussion prompted Gilford's other attorney, Mr. McRoyal, to respond. Ms. Kimble asked to be heard, noting that she had requested the sidebar. The court responded, "Wait a second. It doesn't work that way. 'I asked for the sidebar, my co-counsel means nothing.' Okay?" The court and Ms. Kimble proceeded to argue about what had occurred. Their exchange culminated as follows:

"THE COURT: *** Then you butted in to just complain about the whole thing. Wait.

MS. KIMBLE: I butted in?

THE COURT: I'm not finished.

MS. KIMBLE: No, you cannot mischaracterize—

THE COURT: Wait a second.

MS. KIMBLE: I'm actually tired of your mischaracterizations. So if you want to talk about complaining—."

A sheriff's deputy then informed the court that the jury could hear the discussion. The court replied, "Well, she apparently doesn't care. I'm trying to be civil here." A recess followed. Gilford asserts the court's comments during the sidebar exchange reveal an animus and bias toward his counsel.

¶ 48        "The fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel." *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007). "Expressions of dissatisfaction, annoyance, impatience, and anger are within the bounds of what judges sometimes display and do not establish bias or partiality." *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 74, *overruled on other grounds*, *People v. Fair*, 2024 IL 128373. While the trial judge here displayed such emotions in the sidebar discussion, we are unpersuaded that he did so to a degree that would warrant a finding of resulting prejudice.

¶ 49 Overall, whether considered individually or collectively, we are unpersuaded that the trial court's comments were a material factor in the conviction or resulted in probable prejudice. The evidence was not closely balanced, and an acquittal would not have been likely in the absence of the comments.

¶ 50 III. CONCLUSION

¶ 51 Based on the foregoing, we affirm the judgment of the circuit court.

¶ 52 Affirmed.